UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                          CRIMINAL ACTION

VERSUS                                            NO:  21-126

EMPIRE BULKERS LTD., JOANNA                       SECTION: "S" (4)
MARITIME LIMITED, AND
WARLITO TAN

ORDER AND REASONS

     **IT IS HEREBY ORDERED** that the **Motion to Dismiss Count 1** (Rec. Doc. 43) filed

by Warlito Tan is **DENIED**;

     **IT IS FURTHER ORDERED** that the **Motion to Dismiss Count 4** (Rec. Doc. 44) filed

by Warlito Tan is **DENIED**;

     **IT IS FURTHER ORDERED** that the **Motion to Strike Surplusage from the**

**Indictment** (Rec. Doc. 45) filed by Empire Bulkers, Ltd., and Joanna Maritime Limited

("organizational defendants") is **DENIED**;

     **IT IS FURTHER ORDERED** that the **Motion to Dismiss Indictment Due to**

**Constitutional and Statutory Violations** (Rec. Doc. 66) filed by Warlito Tan is **DENIED**.

BACKGROUND

     This case stems from the United States Coast Guard's ("Coast Guard's") findings in an

inspection of the MV JOANNA ("JOANNA"), a 23,494 gross-ton bulk cargo carrier registered

in the Marshall Islands. On March 6, 2021, the JOANNA arrived at the Port of New Orleans,

Louisiana. The Coast Guard conducted a Port State Control inspection of the ship on March 11, 2021. During the inspection, the Coast Guard discovered a concealed modification to a valve handle for the Oil Content Meter (hereinafter, sometimes "OCM") which had been made prior to the vessel's arrival in New Orleans. The modification prevented the sensor from analyzing a true sample of overboard discharges, so that the discharged effluent would appear to have a lower concentration of oil, making it permissible to discharge it under applicable regulations.

The Oil Content Meter electronically records data of past operations and stores it on a data card. The Coast Guard seized the Oil Content Meter and data card and had it analyzed by the OCM vendor and a government expert. The recorded data was consistent with the use of the unauthorized modification of the Oil Content Meter valve handle and inconsistent with proper operation. The modification to the Oil Content Meter made the actual concentration of oil discharged overboard impossible to determine. However, it is the government's position that the copious amounts of oil that were found inside the Oily Water Separator (hereinafter, sometimes "OWS") and overboard piping, strongly suggest that oil was discharged in greater concentrations than permitted by applicable law.

The vessel's Oil Record Book (hereinafter, sometimes "ORB") contains no entries indicating that discharges were made without the proper use of the Oil Content Meter. The entries indicate that overboard discharges occurred on November 10, 2020, January 16, 2021, and February 23, 2021, using a properly functioning Oil Content Meter. The Third Engineer has testified that Chief Engineer, defendant WarlitoTan, made all of the entries and directed him to countersign them.

2

During the inspection of the vessel, the Coast Guard inspectors also noted items that they considered hazardous conditions that could affect the vessel's safety, related to the pre-heaters that heat the marine bunker oil burned on the high seas, which require pressure relief valves because they use steam. The specific problems noted were: the discharge line downstream from the fuel-oil pre-heaters and pressure relief valves was disconnected and crimped closed, disabling the pressure relief valves and rendering them inoperable; a pressure relief valve on a fuel oil pre-heater was not working properly; and there was an active fuel oil leak from the fuel oil pre-heaters and pressure relief valves. At the time of the inspection, because it was in port, the JOANNA was utilizing diesel fuel which does not require pre-heating. The fuel was running through the pre-heaters, but was not receiving steam or being heated. At the time of the Coast Guard's discovery of the leak, a temporary repair had recently been made by the crew.

The indictment alleges that Warlito Tan, and vicariously, Joanna Maritime and Empire Bulkers Ltd. ("Empire"), committed four crimes: failure to maintain an accurate Oil Record Book for the JOANNA while in the Port of New Orleans, obstruction of agency proceeding, obstruction of justice, and failure to immediately notify the U.S. Coast Guard Sector of an alleged hazardous condition experienced aboard the JOANNA when the vessel was in the United States.

In the instant motion, the defendants have moved to dismiss Counts One and Four of the indictment, moved to dismiss the indictment in its entirety, and moved to strike surplusage in the indictment.

3

**DISCUSSION**

*Legal Standard*

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). An indictment is sufficient if it: "first ... contains the elements of the offenses charged and fairly informs a defendant of the charge against which he must defend, and, second ... enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Resendiz–Ponce, 549 U.S. 102, 108 (2007) (quotations omitted). Generally, an indictment that tracks the statutory language of the charged offense is constitutionally sufficient, as long as the statutory language unambiguously sets out all of the necessary elements of the offense. See e.g., U.S. v. Hagemann, 950 F.2d 175, 183 (5th Cir.1991); U.S. v. Gordon, 780 F.2d 1165, 1169 (5th Cir.1986). Dismissal of an indictment is limited to "extraordinary situations". United States v. McFadden, 59 F.3d 1243, n. 4 (5th Cir. 1995). When considering a motion to dismiss an indictment, the court must accept the allegations in the indictment as true. Boyce Motor Lines v. United States, 342 U.S. 337 (1952).

*Statutory Framework*

The United States is a signatory to the 1973 International Convention for the Prevention of Pollution from Ships, as amended in 1978. 1340 U.N.T.S. 184; 1340 U.N.T.S. 61. These treaties are collectively called "MARPOL," an abbreviation for maritime pollution, and their purpose is to "achieve the complete elimination of international pollution of the marine environment by oil and other harmful substances." 1340 U.N.T.S. at 128.

4

To implement MARPOL, Congress enacted the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901 et seq. "The APPS prohibits violations of MARPOL, the APPS, and the regulations promulgated pursuant to [33 U.S.C.] § 1903(b)." United States v. Jho, 534 F.3d 398, 401 (5th Cir. 2008). The APPS authorizes the United States Coast Guard to "prescribe any necessary or desired regulations to carry out the provisions of ... MARPOL." 33 U.S.C. § 1903(c)(1); see also 33 C.F.R. § 151.01 et seq.

MARPOL and federal law both require all oceangoing ships exceeding 400 gross tons to maintain an Oil Record Book, kept "readily available for inspection at all reasonable times." 33 C.F.R. §§ 151.25(a), (I). "Disposal of oil residue" or "[d]ischarge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces" are required to be recorded in the Oil Record Book. 33 C.F.R. §§ 151.25(d)(3)-(4). "The master or other person having charge of a ship required to keep an Oil Record Book shall be responsible for the maintenance of such record." 33 C.F.R. § 151.25(j). The APPS and its regulations apply to foreign-flagged vessels only when they are "in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States." 33 C.F.R. § 151.09(a)(5); see also 33 U.S.C. § 1902(a)(2).

The Ports and Waterways Safety Act of 1972 ("PWSA"), 46 U.S.C. §70001 et seq., was originally enacted in response to a 1967 oil spill off the coast of England. United States v. Locke, 529 U.S. 89, 101 (2000). Its main purposes were reducing the possibility of vessel or cargo loss, protecting the marine environment, preventing damage to structures on or adjacent to navigable waters, and ensuring that vessels complied with applicable standards for safety and operation. 33

5

U.S.C. § 1221(c) (repealed 2018).[1] It provides for criminal penalties for violations of the PWSA. 46 U.S.C. § 70036(b).

## I.   Warlito Tan's Motion to Dismiss Count 1[2]

Count One charges defendants with a knowing violation of the APPS while in U.S. waters. The indictment charges:

> On or about March 11, 2021, at the Port of New Orleans, and within the Eastern District of Louisiana, and elsewhere [the Defendants] did knowingly fail and cause the failure to maintain an accurate ORB for the MV JOANNA, in which quantities of oil residue, oily mixtures, and machinery space bilge water, and the discharge and disposal of these substances, were fully and accurately recorded, as required. Specifically, during the period of on or about October 25, 2020, through on or about March 11, 2021, the Defendants [(1)] falsely recorded and caused to be falsely recorded that discharges of oily bilge water had been made through a properly functioning OWS and OCM when they had not, and (2) failed to record exceptional discharges of oily bilge water made without the use of a properly functioning OWS and OCM, in violation of Title 33, United States Code, Section 1908(a), Title 18, United States Code, Section 2(b), and Title 33, Code of Federal Regulations, Section 151.25.

Chief Engineer Tan has moved to dismiss Count One arguing that chief engineers on foreign-flagged vessels in U.S. waters cannot be prosecuted for having previously failed to maintain an oil record book, because pursuant to 33 C.F.R. § 151.25(j) that duty is statutorily assigned exclusively to the "master or other person having charge of the ship." Tan further

---

[1] The provisions of the PWSA were re-codified in Title 46 in 2018. PL 11-282, Dec. 4, 2018, 132 Stat 4192. The original Statement of Policy setting forth the purposes of the enactment, codified at 33 U.S.C. § 1221, was not retained. It is available at: https://uscode.house.gov/view.xhtml?req+granuleid:USC-2000-title33-section1221&num=0& edition=2000#miscellaneous-note.

[2] This motion was filed by Warlito Tan, but subsequently the organizational defendants joined and adopted the motion. See Rec. Doc. 58.

6

contends Count One does not charge a violation of a particular regulation or statute, but rather a violation of the "Legal Framework" set forth in the indictment. Tan argues that to the extent the regulations do allow U.S. prosecution for foreigners' high seas record keeping, the regulations are *ultra vires* and/or violate the non-delegation doctrine. Finally, Tan argues that Count One is not alleged with sufficient particularity.

### A. May a Chief Engineer be prosecuted under the APPS in connection with a failure to maintain the ORB?

Tan is correct that the plain language of 13 C.F.R. § 151.25(j) is directed towards "the master or other person having charge of a ship." He is also correct that the Fifth Circuit in United States v. Fafalios, 817 F.3d 155 (2016), dismissed a count against a chief engineer stating: "Chief engineers on foreign-flagged vessels cannot, however, be prosecuted simply for having previously failed to maintain an oil record book once a ship enters U.S. waters, since 33 C.F.R. § 151.25 assigns that duty explicitly and exclusively to the "master or other person having charge of the ship." 817 F.3d at 162.

However, the Fafalios court did not consider whether the engineer in that case could be prosecuted for aiding and abetting the statutorily designated maintainer(s) of the ORB. In contrast, in this case, the indictment charges Tan with causing the master's failure to maintain an accurate ORB, pursuant to 18 U.S.C. § 2(b). That statute provides: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." Thus, Tan is not being prosecuted "simply for having previously failed to maintain an oil record book once a ship enters U.S. waters," as occurred in

Fafalios, but for causing the master or other person having charge of the ship to fail to maintain an accurate ORB for inspection upon entry to the Port of New Orleans.

Tan also claims that the charges under section 2(b) are insufficient because the indictment does not explain how he wilfully caused the offense. To the contrary, the indictment alleges that Tan "falsely recorded and caused to be falsely recorded that discharges of oily bilge water had been made through a properly functioning OWS and OCM when they had not, and (2) failed to record exceptional discharges of oily bilge water made without the use of a properly functioning OWS and OCM. . . ." Indictment, Count I(B). Tan's role in the offense is explicit.

Tan further contends that a charge that he aided and abetted others in failing to maintain an accurate ORB alleges that he caused a failure to perform, which is an act of omission and thus not cognizable under section 2(b). However, the substantive crime alleged was not an act of omission. As the Fifth Circuit has observed, the "gravamen of the action was not the pollution itself, or even the Oil Record Book violation occurring at that time, but the misrepresentation in port." Jho, 534 F.3d 404 (internal quotations and citations omitted). Tan is charged with aiding, abetting, and causing the commission of the misrepresentation in port. The court finds that Count One adequately charges Tan with aiding and abetting.

The court in Fafalios explicitly recognized that a chief engineer "apparently may be prosecuted for aiding and abetting the failure to maintain an accurate record book." 817 F.3d at 160; see also United States v. Vastardis, 19 F.4th 573 (3rd Cir. 2021). That is what Tan is charged with here. Accordingly, Tan's status as chief engineer rather than master does not require dismissal of Count One.

**B.   Does Count 1 fail to charge a violation of a particular regulation or statute?**

Tan also argues that Count One charges a violation of the "Legal Framework" of the

indictment, which asserts that defendants did "knowingly fail and cause the failure to maintain

an accurate ORB", because the phrase "maintain an accurate oil record book" does not appear in

33 U.S.C. § 1908 or other applicable statutes, regulations, or MARPOL. Tan further contends

that interpreting the rules to require a vessel owner or master to "maintain" an ORB while in the

United States impermissibly reaches conduct that occurred on the high seas, because the alleged

illegal discharges and false ORB entries were made in international waters prior to arrival in the

Port of New Orleans.

> Concerning Oil Record Books, the Code of Federal Regulations provides in part:
>
> Each oil tanker of 150 gross tons and above, ship of 400 gross tons and above
> other than an oil tanker, and manned fixed or floating drilling rig or other
> platform *shall maintain* an Oil Record Book Part I (Machinery Space Operations).
> An oil tanker of 150 gross tons and above or a non oil tanker that carries 200
> cubic meters or more of oil in bulk, *shall also maintain* an Oil Record Book Part
> II (Cargo/Ballast Operations).

33 C.F.R. § 151.25 (emphasis added).

Clearly, the applicable regulations require the maintenance of an ORB. Moreover, this

requirement has been interpreted to mean that the ORB must be accurate. As the Third Circuit

has observed, no reasonable reader could conclude otherwise. Vastardis, 19 F.4th at 583. "The

recordkeeping provision would make little sense if … it required that ships only physically

possess an Oil Record Book in any state of completeness or accuracy. Because an Oil Record

Book must be accurately maintained under § 151.25, and because § 151.25 applies to foreign

ships while they are in U.S. waters or a U.S. port, the arrival in U.S. waters or a U.S. port of a

9

ship with an inaccurate Oil Record Book constitutes a violation of that regulation." Id.

Further, in Jho, the Fifth Circuit explained that "we read the requirement than an oil record book be 'maintained' as imposing a duty upon a foreign-flagged vessel to ensure that its oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States." 534 F.3d at 403. Accordingly, the court rejects Tan's contention that the regulation does not require maintenance of an accurate ORB, and that the regulations impermissibly reach high seas activities. The activity charged did not take place on the high seas; it is not the illegal discharge, but the presentation of the inaccurate record book, which Tan is alleged to have aided and abetted or otherwise caused, and which occurred in the Port of New Orleans. "[K]nowing violations of 33 C.F.R. § 151.25 carried out by foreign-flagged vessels in U.S. ports may be prosecuted under 33 U.S.C. §1908(a) as wholly domestic offenses." Jho, 534 F.3d at 404. Accordingly, the indictment does not fail to charge a valid violation.

### C. Do the regulations violate *ultra vires* limitations or the non-delegation doctrine?

### 1. *Ultra Vires* doctrine

Tan argues that a regulation intended to allow U.S. prosecution for a foreigner's high seas record keeping is "*ultra vires*", that is, it exceeds the authorization granted to the regulators by Congress, and that MARPOL and APPS expressly provide for flag state enforcement of high seas events, including record book entries.

As set forth above, the activity charged in this case did not occur on the high seas, it occurred when the falsified ORB was presented to Coast Guard authorities in New Orleans. Further, "MARPOL allows for concurrent jurisdiction between a flag state and a non-flag state

when MAPROL violations occur within the jurisdiction of the non-flag state." <u>Jho</u>, 534 F.3d at 403 n.3. Thus, the agency regulation complained of does not regulate activity on the high seas, nor does it exceed the authorization granted to the regulators by Congress.

### 2. Non-delegation doctrine

Tan also argues that to the extent the regulations at issue attempt to permit the Coast Guard to punish high seas recordkeeping, they are at odds with MARPOL and APPS and thus constitute an impermissible delegation of legislative power. Specifically, Tan contends that the regulation constitutes an impermissible delegation of the fundamental power to decide when and whether to punish foreigners as criminals for conduct outside the United States, and to disregard the interests of the flag states of the accused. As previously noted, the regulation is aimed at behavior within the United States: presenting an inaccurate ORB in a U.S. port. The regulation does not police behavior on the high seas, but rather, prohibits lying about the behavior upon arrival in the United States. Accordingly, it is not the product of an impermissible delegation of the power to punish foreigners for criminal conduct outside of the United States.

### D.   Is Count 1 alleged with sufficient particularity?

Tan argues that Count One is impermissibly vague because the JOANNA's ORB for the October-March period contains four pages of entries, and he does not know which entries he must defend. In addition, he argues that Count One implies Tan failed to make entries for exceptional discharges, without providing specific dates, times, and locations.

Under the Sixth Amendment, an indictment must "(1) enumerate each prima facie element of the charged offense; (2) fairly inform the defendant of the charges filed against him;

and (3) provide the defendant with a double jeopardy defense against future prosecutions." U.S. v. Guzman Ocampo, 236 F.3d 233, 235 (5th Cir. 2000) (quoting U.S. v. Gaytan, 74 F.3d 545, 551 (5th Cir.1996)). Similarly, Rule 7(c) of the Federal Rules of Criminal Procedure requires an indictment to contain "a plain, concise and definite written statement of the essential facts constituting the offense charged," and to "state for each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated." These requirements ensure that the defendant has notice of the charges against him and that the grand jury found probable cause that the defendant committed each element of the offense. See Guzman–Ocampo, 236 F.3d at 235. Generally, an indictment that tracks the statutory language of the charged offense is constitutionally sufficient, as long as the statutory language unambiguously sets out all of the necessary elements of the offense. See e.g., U.S. v. Hagemann, 950 F.2d 175, 183 (5th Cir.1991); U.S. v. Gordon, 780 F.2d 1165, 1169 (5th Cir.1986). An indictment that meets minimal constitutional standards is sufficient to warrant a trial of the charges on the merits. See Costello v. United States, 350 U.S. 359, 363 (1956).

Count One sufficiently alleges all of the elements of the offense charged, namely, that on March 11, 2021, at the Port of New Orleans, the defendants failed to maintain or caused the failure to maintain the ORB, in violation of 33 U.S.C. 1908(a), 18 U.S.C. 2(b), and 33 C.F.R. 151.25. The indictment specifies the date range during which the false entries were made, and explains two means of failing to maintain the ORB, by falsely stating that discharges had been made via a properly functioning OWS and OCM when they had not, and by failing to record non-compliant discharges on three specific dates, as confirmed by the stored data in the ships Oil

Content Meter. Thus, the defendants have fairly been informed of the charges against them.

## II. Warlito Tan's Motion to Dismiss the Count 4[3]

### A. May a Chief Engineer be prosecuted for failure to report a hazardous condition?

Count Four charges the defendants with knowingly violating the PWSA by failing to notify the U.S. Coast Guard of a hazardous condition on board the JOANNA when the vessel was located within the United States. Tan has moved to dismiss the count, arguing that as a chief engineer, he is not a required reporter under the applicable regulation, and thus he cannot be charged with the offense. Tan also argues that the regulation upon which Count Four is premised is void for vagueness, especially in criminal prosecutions.

The applicable regulation provides:

> Whenever there is a hazardous condition either on board a vessel or caused by a vessel or its operation, the owner, agent, master, operator, or person in charge must immediately notify the nearest Coast Guard Sector Office or Group Office, and in addition submit any report required by 46 CFR 4.05-10.

33 CFR § 160.216(a). "Hazardous condition" is defined as "any condition that may adversely affect the safety of any vessel, bridge, structure, or shore area or the environmental quality of any port, harbor, or navigable waterway of the United States. It may, but need not, involve collision, allision, fire, explosion, grounding, leaking, damage, injury or illness of a person aboard, or manning-shortage." Id., § 160.202. The regulation applies to all commercial vessels and to all foreign vessels "that are bound for or departing from ports or places within the navigable waters of the United States …." Id., §160.203.

---

[3] This motion was filed by Warlito Tan, but subsequently the organizational defendants joined and adopted the motion. See Rec. Doc. 58.

Tan argues that this formulation fails to put persons on fair notice of what is required by the statute, thus granting prosecutors unfettered discretion as to when to charge a target. Tan also asserts that "hazardous condition" is defined so broadly as to be meaningless, and because it applies to conditions that "affect" safety, it could apply to perfectly safe conditions, if they were rendered marginally less safe. Tan complains that the regulation does not require that the condition actually affect safety, only that it *may affect* safety. Tan points to the declaration of Glenn Robins, an American commercial fisherman, to the effect that American mariners cannot and do not comply with the regulation, and that most are not aware of it.

With respect to Tan's argument that he is not a required reporter, and thus not subject to the statute, the indictment alleges that "[o]ther members of the ship's crew, including Chief Engineers, may aid and abet and cause the vessel master's failure to report a hazardous condition under 18 U.S.C. § 2(b), and therefore be charged as a principal." Indictment, ¶ 12. Thus, while he is not himself a required reporter, the Grand Jury has charged Tan with aiding and abetting, or otherwise causing, the failure to report. As such he is culpable to the same degree as a principal. 18 U.S.C. § 2.

With respect to the contention that the statue is void for vagueness, courts "consider whether a statute is vague as applied to the particular facts at issue, for [a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" Holder v. Humanitarian L. Project, 561 U.S. 1, 18-19 (2010) (internal quotations omitted). In this case, the condition observed by the Coast Guard was a fuel leak and a crimped and disabled pressure relief valve on a fuel pre-heater. The ship's own safety

14

management system forbids plugging or gagging the safety and relief valves. The risks of a fuel leak are obvious, and affect the safety of the vessel. On these facts, the court finds the regulation is not impermissibly vague. The regulation clearly requires the reporting of conditions that affect the vessel's safety, and such a condition was present.

### B. Is the hazard reporting regulation *ultra vires*?

Tan also argues that 33 C.F.R. § 160.216,[4] which requires the reporting of hazardous conditions, is an *ultra vires* assertion of regulatory authority. An act of a federal agency is *ultra vires* if it exceeds the authority given to it by Congress. Velaquez v. Sessions, 713 F. App'x 282, 285 (5th Cir. 2017). Tan contends that the PWSA was primarily designed to avoid oil spills or other environmental disasters in coastal waters, not to provide for catch-all regulation of conditions on board vessels. Tan further argues that nothing in the PWSA directly or indirectly gives the Coast Guard authority to require notification of all potential safety hazards on board a vessel. He asserts that the PWSA allows the Coast Guard to issue regulations "necessary to implement" subchapters I through IV, but these subchapters do not cover general safety conditions on or within a vessel and do not require Coast Guard notification of such conditions. According to Tan, by its terms, section 160.216 is not limited to hazards to navigation or to the marine environment in U.S. waters, which is the subject of the PWSA, but improperly encompasses vessel safety generally.

The PWSA instructs that "the Secretary shall issue... regulations necessary to implement subchapters I through III and this subchapter." 46 U.S.C. § 70034(a). Further, the "Secretary

---

[4] Excerpted supra.

may investigate any . . . act . . . that affects or may affect the safety or environmental quality of the ports, harbors, or navigable waters of the United States." 46 U.S.C. § 70035(a). Subchapter II provides in part:

> The Secretary may take such action as is necessary to–
>
> (1) prevent damage to, or the destruction of, any bridge or other structure on or in the navigable waters of the United States, or any land structure or shore area immediately adjacent to such waters; and
>
> (2) protect the navigable waters and the resources therein from harm resulting from vessel or structure damage, destruction, or loss.

46 U.S.C. § 70011(a). Specific actions authorized to achieve this goal include "establishing procedures for examination to assure compliance with the requirements prescribed under this section." 46 U.S.C. § 70011(b)(4).

Thus, by its terms, the statute directs the Secretary to *prevent* damage in U.S. ports and waterways, from harm resulting from vessel damage. Requiring hazards on vessels that could affect safety to be reported upon arrival in port is an obvious and reasonable means to achieve this legislative directive. It does not exceed Congress's grant of authority to the agency, and thus, is not an *ultra vires* exercise of regulatory power.

**C. Does the PWSA violate non-delegation principles?**

Title 46, section 70034 of the PWSA provides in part: "the Secretary shall issue, and may from time to time amend or repeal, regulations necessary to implement subchapters I through III and this subchapter." 46 U.S.C.A. § 70034(a). Tan contends that to the extent section 70034 of the PWSA authorizes regulation of *anything* impinging on safety, it grants too much legislative leeway to the Coast Guard to regulate and thus violates non-delegation principles. In support,

16

Tan contends that the PWSA does not include a policy statement that provides an intelligible principle to guide regulation, and that under the aegis of the PWSA, the Coast Guard has essentially issued its own criminal code.

The non-delegation doctrine "is rooted in the principle of separation of powers that underlies our tripartite system of Government." Mistretta v. United States, 488 U.S. 361, 371, (1989). Under that system, "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I, § 1. Because "the lawmaking function belongs to Congress," Loving v. United States, 517 U.S. 748, 758 (1996), Congress "may not constitutionally delegate [that] power to another" branch of government. Touby v. United States, 500 U.S. 160, 165 (1991). This safeguard is known as the non-delegation doctrine.

Nevertheless, Supreme Court jurisprudence reflects "a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives. . . ." Mistretta, 488 U.S. at 372. Accordingly, "[d]elegations are constitutional so long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized [to exercise the authority] is directed to conform.' " Big Time Vapes, Inc. v. Food & Drug Admin., 963 F.3d 436, 441 (5th Cir. 2020), cert. denied, 141 S. Ct. 2746 (2021) (quoting J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 409 (1928). "It is 'constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of th[e] delegated authority.' " Id. at 442 (quoting Am. Power & Light Co. v. SEC, 329 U.S. 90, 105 (1946). "Those standards ... are not demanding." Id. (quoting Gundy v. United

States, 139 S. Ct. 2116, 2129 (plurality)). For this reason, while Congress has made delegations since it was formed, the Supreme Court did not find a delegation of legislative power unlawful until 1935, when it found two delegations unconstitutional. Id. (citing Pan. Ref. Co. v. Ryan, 293 U.S. 388, 433 (1935); A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 542 (1935). The Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law," and thus has not found an impermissible delegation since 1935. Id. at 442-43 (quoting Am. Trucking, 531 U.S. at 474–75).

In determining if a statute constitutes an impermissible delegation, courts are not limited to the text alone. Id. at 443. To determine if Congress set out a sufficiently intelligible principle, courts must consider the "the purpose of the [statute], its factual background[,] and the statutory context." Id. (internal quotations and citations omitted).

Contrary to Tan's assertion, while it was not retained in the re-codification of the PWSA, the PWSA was enacted with a policy statement. It provided:

§ 1221. Statement of policy

The Congress finds and declares-

(a) that navigation and vessel safety and protection of the marine environment are matters of major national importance;

(b) that increased vessel traffic in the Nation's ports and waterways creates substantial hazard to life, property, and the marine environment;

(c) that increased supervision of vessel and port operations is necessary in order to-

　　(1) reduce the possibility of vessel or cargo loss, or damage to life, property,

18

or the marine environment;

(2) prevent damage to structures in, on, or immediately adjacent to the navigable waters of the United States or the resources within such waters;

(3) insure that vessels operating in the navigable waters of the United States shall comply with all applicable standards and requirements for vessel construction, equipment, manning, and operational procedures; and

(4) insure that the handling of dangerous articles and substances on the structures in, on, or immediately adjacent to the navigable waters of the United States is conducted in accordance with established standards and requirements; and

(d) that advance planning is critical in determining proper and adequate protective measures for the Nation's ports and waterways and the marine environment, with continuing consultation with other Federal agencies, State representatives, affected users, and the general public, in the development and implementation of such measures.[5]

Further, the PWSA requires the Coast Guard to take whatever action is necessary to "prevent damage to, or the destruction of, any bridge or other structure on or in the navigable waters of the United States, or any land structure or shore area immediately adjacent to such waters", as well as to "protect the navigable waters and the resources therein from harm resulting from vessel or structure damage, destruction, or loss." 46 U.S.C. § 70011(a).

Applying the intelligible principle test, the court finds that the statute challenged by Tan does not violate the non-delegation doctrine. In the PWSA and its enacting legislation, Congress set forth a general policy, the agency to apply the policy, and the limits of the agency's authority, that is, to prevent damage to the ports and waterways of the United States, and to protect the navigable waters from harm resulting from vessel or structure damage. Because the mandate

---

[5] See supra, note 1.

19

requires efforts to prevent damage, the Coast Guard has reasonably concluded that reporting

hazardous conditions on vessels upon arrival in U.S. ports will advance this objective. Tan's

argument that the PWSA violates the non-delegation doctrine fails.

### III.    Organizational Defendants' Motion to Strike Surplusage from Indictment[6]

In this motion, defendants argue that parts of the indictment should be stricken as

surplusage, because they serve only to prejudice, inflame, and confuse the jury.

In contextualizing the count for failure to maintain the ORB, in which the vessel master

is required to record any overboard discharges, disposals, and transfers of oily mixtures, sludge,

waste oil or bilge water, the indictment sets out at length descriptions of those substances and

how the vessel is required to dispose of them. As context for the count regarding failure to notify

of a hazard – the alleged hazard being a problem with the oil heater system – the indictment also

describes the fuel-oil heater system and how it is outfitted to prevent explosions.

Defendants argue that the objected to language contains misleading and argumentative

facts not relevant to the charged elements of the crime, and thus will prejudice, inflame, and

confuse the jury. They argue that details regarding requirements for disposal of oily discharge

may mislead the jury into thinking the defendants have been charged with polluting, when they

are actually charged with a record-keeping violation. They argue that reference to explosions

caused by fuel-oil heater systems may suggest to the jury that the vessel was at risk of exploding,

while there was never a risk of the fuel heater exploding. Defendants also claim that the

---

[6] This motion was filed by the organizational defendants, but subsequently Warlito Tan joined and adopted the motion. See Rec. Doc. 51.

language misleads by suggesting that the laws invoked apply to activities outside of the United States, and they do not.

The government opposes the motion, arguing that the objected to language provides important context helpful to the jury's understanding of the charges, and that the descriptions therein are accurate.

Federal Rule of Criminal Procedure 7(d) authorizes the court to "strike surplusage from the indictment or information" upon the defendant's motion. FED. R.CRIM. PRO. 7(d).  "The mere fact that information in an indictment does not constitute an element of the charged offense does not require that it be stricken." United States v. Solomon, 273 F.3d 1108 (5th Cir. 2001). "For language to be struck from an indictment, it must be irrelevant, inflammatory, and prejudicial." United States v. Graves, 5 F.3d 1546, 1550 (5th Cir.1993). Because the standard is "exacting", a court rarely grants such a motion. WRIGHT & MILLER, 1 FED. PRAC. & PROC. CRIM. § 128 (4th ed.) (citing United States v. Hedgepeth, 434 F.3d 609, 611 (3rd Cir. 2006) ("Motions to strike surplusage are rarely granted.")).

A review of the indictment reflects that it includes language that could be potentially confusing to the jury. Paragraph 6 of the indictment, which details the allowable methods for disposing of oily mixtures, sludge, and waste oil, may suggest that defendants are charged with polluting, when they are in fact charged with a record-keeping violation. Paragraph 10, which describes MARPOL Regulations for the Prevention of Pollution by Oil, including the allowable parts-per-million of oil which may discharged overboard, may also falsely suggest pollution is being charged.

21

However, under the exacting standard for striking language in an indictment, to be stricken, the alleged surplusage must be irrelevant, inflammatory, *and* prejudicial. Whatever inflammatory effect it might have, in addition to the fact that the objected to language may be relevant as helpful context, defendants cannot establish that it is prejudicial. Before deliberating, the jury will be given instructions which will make clear to them what defendants are actually charged with. Further, the verdict form will not ask the jury to consider issues for which defendants have not been charged. This cures any potential prejudice from the alleged surplusage, and the motion to strike is therefore denied.

## IV.    Tan's Motion to Dismiss Indictment Due to Constitutional and Statutory Violations[7]

In this motion, Tan argues that in detaining him[8] on a material witness warrant for six months prior to indicting him,[9] the government violated his rights under the Fourth, Fifth, and Sixth Amendments to the United States Constitution and the Speedy Trial Act. Tan further contends that if the government disputes that the use of the material warrant was pretextual, disclosure of its in-camera submissions and an evidentiary hearing are required to resolve this

---

[7] This motion was filed by Warlito Tan, but subsequently the organizational defendants joined and adopted the motion. See Rec. Doc. 71.

[8] Tan was not incarcerated but rather detained in the Eastern District of Louisiana, where he was required via a security agreement between the government and his employer to stay in a hotel separate from the other witnesses. He received wages, lodging, medical care, and a per diem for the duration at his employer's expense. He was required to surrender his passport, but it was returned to him and he was allowed to leave and travel to the Philippines following his father's death. He subsequently returned to the district as agreed.

[9] The warrant was signed on March 25, 2021, and Tan was indicted on September 30, 2021.

motion.[10]

The government opposes, contending that these arguments have all been previously raised in Tan's motion to quash the warrant, which was denied by Magistrate Judge Van Meerveld and adopted by Judge Ashe in Case No. 21-mc-592. Therefore, the government contends that "law of the case" prohibits the court from re-visiting those decisions.

In the Fifth Circuit, the law of the case doctrine is applicable in a situation " 'in which one judge has rendered an order or judgment and the case is then transferred to another judge.' " In re Ford Motor Co., 591 F.3d 406, 411 (5th Cir. 2009) (quoting United States v. O'Keefe, 128 F.3d 885, 892 (5th Cir.1997)). "Under the law of the case doctrine and general principles of comity, a successor judge has the same discretion to reconsider an order as would the first judge, but should not overrule the earlier judge's order or judgment merely because the later judge might have decided matters differently." Id. at 411 (citations and internal quotations omitted). "The law of the case doctrine requires that courts not revisit the determinations of an earlier court unless '(i) the evidence on a subsequent trial was substantially different, (ii) controlling authority has since made a contrary decision of the law applicable to such issues, or (iii) the decision was clearly erroneous and would work ... manifest injustice.' " Id. at 411-412 (quoting Propes v. Quarterman, 573 F.3d 225, 228 (5th Cir. 2009).

At oral argument, Tan acknowledged that the prior rulings adjudicated the constitutional

---

[10] Thus, in a separate motion pending before the Magistrate Judge, Tan seeks "all documents, correspondence, reports, and/or memoranda filed by the government with U.S. Magistrate Judge van Meerveld (and/or any other judicial officer relating to these proceedings), including any filings under seal, including but not limited to submissions made in the action In re M/V JOANNA, 21-mc-592-BWA-JVM."

violations grounded in the Fourth Amendment. Tan's Fifth Amendment claims, premised on the fact that he was not afforded an evidentiary hearing by Magistrate Judge Van Meerveld, were not addressed at oral argument, but the court notes that Judge Ashe specifically ruled that an evidentiary hearing was unnecessary, and would place at risk the secrecy of the Grand Jury proceedings. However, Tan maintains that his Sixth Amendment/Speedy Trial Act claims were not addressed in the prior proceeding. He further argues that the Supreme Court precedent relied upon applied only to Fourth Amendment claims, not to Sixth Amendment/Speedy Trial Act claims.

A review of Tan's motion to quash reflects that he raised the issue of the alleged Speedy Trial Act violation before Magistrate Judge Van Meerveld.[11] He also raised the issue in his appeal of Magistrate Judge Van Meerveld's ruling to Judge Ashe, asserting as an assignment of error: "The Order and Reasons expressly or implicitly holds that the government and the Court may arrest and indefinitely detain as a material witness a target or potential target whom the government claims it has not yet finally decided either to charge or to call as a witness, including for the purpose of defeating the detainee's rights under the Speedy Trial Act[.]"[12] This assertion is clearly at odds with the position Tan now takes, that his Speedy Trial Act claim was not adjudicated in Magistrate Van Meerveld's opinion, adopted by Judge Ashe.

In her ruling, Magistrate Judge Van Meerveld found that grand jury proceedings are "criminal proceedings" for purposes of the material witness statute, citing <u>United States v.</u>

_____

[11] 21-mc-592, Doc. 20-1, 17.

[12] 21-mc-592, Doc. 106, 2.

24

Awadallah, 349 F.3d 42, 55 (2d Cir. 2003). She further found that the material witness statute

can be applied constitutionally to detain individuals with information material to a grand jury

investigation, citing Awadallah and Ashcroft v. al-Kidd, 563 U.S. 731 (2011). She specifically

found that the material witness warrants in this case were facially valid and as a result, applying

the Supreme Court's ruling in al-Kidd, held that the government's subjective intent in issuing

them is not a constitutional consideration, quoting the Supreme Court:  "We hold that an

objectively reasonable arrest and detention of a material witness pursuant to a validly obtained

warrant cannot be challenged as unconstitutional on the basis of allegations that the arresting

authority had an improper motive." 563 U.S. 731 at 744. This holding is unequivocal, and by its

terms not limited to Fourth Amendment questions, but rather applies to any challenge premised

on unconstitutionality. It would seem to foreclose any constitutional challenges based on the

government's motives in seeking the warrant. However, Tan maintains that in this case the

government's motive is relevant, because he is entitled to the benefit of the "ruse exception",

which holds that "the Speedy Trial Act is triggered 'where the defendant demonstrates that the

primary or exclusive purpose of the civil detention was to hold him for future criminal

prosecution.'" United States v. Molina, 535 F. App'x 417, 418 (5th Cir. 2013) (quoting United

States v. De LaPena–Juarez, 214 F.3d 594, 598 (5th Cir. 2000)).

  The court first observes that the case relied upon is an unpublished case that is premised

on authority that pre-dates the Supreme Court's holding in al-Kidd. It also is factually

distinguishable in that it involves a civil detention in an immigration matter, not a material

witness warrant. However, applying the rule as formulated in Molina and De Le Pena-Herez to

25

his case provides Tan no relief. In <u>Molina</u>, the court concluded that

> our review of the record and the testimony presented at the evidentiary hearing
> supports the district court's determination that the ruse exception was not
> applicable in the instant cases. Because the Molinas admitted that they had been
> previously removed following aggravated felony convictions and that they were
> in the United States illegally, *ICE was authorized to detain them pending their
> removal.*

535 F. App'x 417, 418 (emphasis added). Thus, the appellate court concluded that the district

court did not err in declining to apply the ruse exception, because the existence of a valid ICE

detainer foreclosed the possibility that the Molinas could "demonstrate that the primary or

exclusive purpose of their immigration detention was to hold them for future criminal

prosecution." <u>Id.</u> at 419 (5th Cir. 2013) (citing <u>De La Pena–Juarez</u>, 214 F.3d at 598). "In short, if

the detaining authorities have a lawful basis for their civil detention, a defendant is not entitled to

invoke the exception."  <u>United States v. Pasillas-Castanon</u>, 525 F.3d 994, 998 (10th Cir. 2008).

In this case it has been established that Tan's material witness arrest warrant was validly

issued and there was a lawful basis for his detention.[13] Accordingly, he is not entitled to invoke

the ruse exception, and further inquiry into the government's motives is unnecessary, because

they are irrelevant. The evidentiary hearing requested to explore the government's motives is

likewise unnecessary. Tan is not entitled to dismissal of the indictment based on any

---

[13] The court also notes that the Federal Rules of Criminal Procedure provide a mechanism
to preempt pretextual detentions in Rule 46(h)(2). That rule provides that "[a]n attorney for the
government must report biweekly to the court, listing each material witness held in custody for
more than 10 days pending indictment, arraignment, or trial. For each material witness listed in
the report, an attorney for the government must state why the witness should not be released with
or without a deposition being taken under Rule 15(a)." The record reflects that Magistrate Judge
Van Meerveld adhered scrupulously to this rule.

CRITICAL

constitutional concerns, including the 6th Amendment as implemented by Speedy Trial Act.

For all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the **Motion to Dismiss Count 1** (Rec. Doc. 43) filed by Warlito Tan is **DENIED**;

**IT IS FURTHER ORDERED** that the **Motion to Dismiss Count 4** (Rec. Doc. 44) filed by Warlito Tan is **DENIED**;

**IT IS FURTHER ORDERED** that the **Motion to Strike Surplusage from the Indictment** (Rec. Doc. 45) filed by Empire Bulkers, Ltd., and Joanna Maritime Limited ("organizational defendants") is **DENIED**;

**IT IS FURTHER ORDERED** that the **Motion to Dismiss Indictment Due to Constitutional and Statutory Violations** (Rec. Doc. 66) filed by Warlito Tan is **DENIED**.

New Orleans, Louisiana, this ___3rd___ day of February, 2022.

_____
**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**