UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 21-126** |
| v. | * | **SECTION: S** |
| **EMPIRE BULKERS LTD.** | * | **MAG: JVM** |
| **JOANNA MARITIME LIMITED** | | |
| **WARLITO TAN** | * | |
| | * | |

\* \* \*

### UNITED STATES' RESPONSE TO DEFENDANTS' JOINING THE MOTION TO QUASH TRIAL SUBPOENAS

Pursuant to the Order of the Honorable Janis van Meerveld (Rec. Doc. 133), the United States, by and through the undersigned attorneys, hereby submits this response to the memoranda submitted by defendants Empire Bulkers Ltd. and Joanna Maritime Limited (Rec. Docs. 137, 138) regarding the motion to quash trial subpoenas (Rec. Doc. 116). Like the movants and Chief Tan[1], the corporate defendants have failed to address the well-settled law thoroughly briefed by the government regarding "unavailability," particularly with regard to the unavailability being caused by the defendants. Rec. Doc. 126.

**I.   Defendants May Not Cause "Unavailability"**

In addition to the fact that the witnesses were served subpoenas and ordered to appear, Fed. R. Evid. 804(a) specifically precludes what the defendants seek: a witness cannot be deemed legally unavailable "if the statement's proponent procured or wrongfully caused the declarant's unavailability as a witness in order to prevent the declarant from attending or testifying."

---

[1] It bears mentioning that defendant Tan's support of the material witnesses' motion to quash is being advocated by local counsel for the material witnesses. Rec. Doc. 127.

As they have throughout these proceedings, the corporate defendants attempt to blur their responsibility for the alleged "unavailability" by hiding behind various corporate entities: "None of the seafarers are employees of Empire. Each crewmember serves onboard a vessel pursuant to a contract for a fixed period that is agreed between the crewmember and the employer. . . ." Rec. Doc. 138 at 1. The defendants then proceed to describe allegedly "separate" entities such as Global Seaways FZC, Stella Marris Shipmanagement Inc., and various corporate shells that own the individual vessels managed by the defendants. *Id*. at 2-3.[2]

These are the exact same arrangements for the Filipino crew that were in place during their voyage on the *MV Joanna* at issue in this case.[3] Indeed, the contracts are almost identical. *See* Exhibit A (current and past contracts of Manual Baliad, Bienvenido Cabanayan, Gerone Bernabe, and Louie Gonzaga).[4] All of these past and present contracts represent Stella Marris Shipmanagement Inc. as the "agent," Global Seaways FZC as the "principal," and Empire Bulkers Limited as the "shipmanager." Just as with the *MV Joanna*, the other vessels (*MV Panagiotis* – Baliad and Cabanayan, *MV Michalis* - Bernabe, and *MV Norah* – Gonzaga) are owned by "ship owners" in the same name: Panagiotis Maritime Limited, Michalis Shipping Ltd., and Norah

---

[2] This is not the case with regard to Capt. Akkaya – who has not yet gone to sea, and when he does, will be right back aboard the *MV Joanna*. Rec. Doc. 137 at 2. Moreover, Captain Akkaya, who opposed being held as a material witness in the United States, returned to the United States after his release on December 29, 2021, and remained until March 2, 2022.

[3] As the Court will remember, pursuant to the Security Agreements between the Coast Guard and the corporate defendants, the organizational defendants paid the salaries, per diem, hotel costs and medical expenses for each of the crewmembers.

[4] The whereabouts of Nimuel Nalagon remain unknown. The United States is interested to learn what efforts his attorney has taken to contact him, both before and after the motion was filed on behalf of Mr. Nalagon. With leave of Court, the United States seeks permission to contact Mr. Nalagon if he is still not in touch with his attorney for the limited purpose of making his travel plans to return to the United States. If Mr. Nalagon remains out of contact with his attorney, then he should not be considered a movant in this matter or excused from subpoena.

Maritime Limited. And, as with the *MV Joanna*, these ships have been and are operated by Empire Bulkers. *See* Exhibit B (November 24, 2020 email from Empire Bulkers to *MV Joanna, MV Panagiotis, MV Michalis*, and *MV Norah*).[5] Additionally, each of these ship owners – none of which apparently have any employees or a separate office from Empire – share common corporate officers. *See* Exhibits C and D.[6]

As this Court is aware, the government was required to engage in extensive litigation against the companies seeking to determine corporate control and ownership. This litigation delayed charging decisions. Although Empire Bulkers repeatedly claimed that it did not own any vessels, the corporate defendants were eventually required to disclose a document that directly conflicts with sworn statements made to the government. According to a Memorandum of Understanding between the Empire Group and a publicly traded shipping firm:[7] "EmpireGroup

---

[5] Although it appears that Empire Bulkers Limited has since changed its website to eliminate the tab identifying its "fleet" of ships, a simple internet archive search shows that these same four ships, along with at least 12 other vessels, were identified as part of the Empire Bulkers "fleet" at least as recently as February 28, 2021. It appears that Empire changed its web page to remove information about its fleet at some point in time after the initiation of the criminal investigation. *See* https://web.archive.org/web/20210228055100/https://www.empirebulkers.com/#FLEET. The material witness warrants in this matter were obtained on March 25, 2021.

[6] Exhibit C are the management contracts between the vessel owners and Empire Bulkers for each of these four vessels (*MV Joanna* was formerly known as *MV Eleni*). The Court will note that each of the contracts are signed by Effie Paraskevopoulou as representative of the allegedly separate vessel owners and Vasileios Koutsolakos on behalf of Empire Bulkers. Exhibit D is a corporate statement submitted in this matter by Empire Bulkers that shows that Ms. Paraskevopoulou is also a Director of Empire Bulkers along with Mr. Koutsolakos.

[7] Even though this MOU was publicly reported (https://www.gulfnav.com/gulf-navigation-sign-mou-with-empire-navigation-involves-the-acquisition-of-various-tanker-vessels/) Empire Bulkers initially denied having records responsive to the government's request for this document, then stated that it was not final, and finally produced it only after being ordered to do so by Judge Ashe. The MOU is signed on behalf of Empire by Stamatis Molaris who is publicly reported to be the owner of the Empire group of companies. *See* https://app.qwoted.com/opportunities/event-shipping-finance-2021 (Stamatis Molaris was a listed speaker in March 2021 on vessel financing and identified as the "Principle of the Empire

consists of two companies [Empire Navigation Inc. and Empire Bulkers Limited] that provide commercial and technical management to modern oil and chemical tanker vessels and drybulk carriers *that it owns directly or indirectly through its subsidiaries* ("Assets")." *See* Exhibit E (emphasis added).[8]

Apparently continuing to obfuscate their control, Empire Bulkers suggests that Stella Marris Shipmanagement/Global Seaways are independent non-party employers of the movants. Even if this were true, they are working on ships *owned and operated* by the organizational defendants. However, an internet search shows that that the Operations Manager/Marine Superintendent at Stella Marris Shipmanagement in the Philippines is also a Senior Marine Superintendent for Empire Bulkers Limited. *See* Exhibit F. This person's employment with Empire Bulkers is confirmed on a list of employees provided to the government by Empire Bulkers. *Id*. at 3. Empire also advertises on its' current website that it is hiring for the same positions maintained

---

Group of companies); https://sites.tufts.edu/turnseries/files/2020/01/Oceans-Turn-Conference-Report-Issuu.pdf at p. 9 (Tufts Fletcher School conference identifying Molaris as Founder and Principle of the Empire Group of Companies); https://splash247.com/empire-bulkers-completes-busy-summer-chopping-and-changing-its-fleet/ (August 7, 2020) ("Molaris Stamatis's Empire Bulkers has emerged as the taker of a widely reported en bloc deal from last month." "*The summer has been a busy period for Empire Bulkers, a company that prefers to keep its business private.*") (emphasis added). The corporate defendants have denied having any records regarding Mr. Molaris, including any emails from or to him. And yet, he signed the MOU in the capacity of representative of EmpireGroup. *See* Exhibit E at 4. All of this is to say that Empire and Joanna have spent a year refusing to be transparent about the ownership and relationship of these entities, including the other vessels in its fleet. If nothing else, this history signifies that any representations made here regarding ownership and control of these corporations and their relationship to the ships cannot be credited whatsoever.

[8] Defendant Empire Bulkers is co-located, and shares common officers and employees, with Empire Navigation. Empire Bulkers operates bulk carriers and Empire Navigation operates tankers. *See* https://www.empirebulkers.com/; https://www.empirenavigation.com/ (last visited April 21, 2022). As is common in certain segments of the maritime industry, Empire Bulkers and Empire Navigation both operate ships that are each owned on paper by a single ship operator with no other assets and with no employees.

by the material witnesses, and that applications should be sent directly to Empire. *See* Exhibit G. In any event, Empire Bulkers and Joanna Maritime were responsible for the crew and their salaries while they were material witnesses in the EDLA, and the witnesses are presently working onboard Empire ships (or are seeking to). Under these circumstances, the organizational defendants must not be permitted to financially threaten the witnesses with loss of employment and loss of salary if they appear for trial in compliance with their subpoenas and the Court's personally delivered Order, of which Empire, the witnesses, and the members of the Joint Defense Agreement were aware.

## II. Trial Subpoenas Are Enforceable

Neither the movants nor the defendants have addressed the well-settled law regarding the "unavailability" of witnesses as thoroughly briefed by the government (Rec. Doc. 126). Because of these strictures, and because of past experience with counsel for the defendants and similarly situated defendants, the government insisted that the witnesses be personally served with trial subpoenas and admonished about their duty to return for trial prior to their departure. All promised to do so under oath. This was done in open court, on the record, and in front of the defendants who participated in the proceedings.

There is no evidence in the record that defendants advised the witnesses of the alleged consequences of entering into new contracts. There is similarly no evidence in the record that defendants (or other closely related entities) are incapable of arranging a temporary replacement rather than a permanent replacement. Empire asserts that there are "no temporary or partial employment contracts" generally citing a web page that does not appear to contain any such specific provision. *See* Empire Joining Motion at 5 and n.5. Not only is this claim unsupported

5

with specific authority, but short-term crews including "riding teams" with specific short-term assignments are frequent occurrences in the maritime industry.

Undersigned counsel have consulted with the Aviation, Space & Admiralty Litigation Section of the U.S. Department of Justice. They report that in their litigation experience, with proper planning, short term replacements have been arranged within the American system in order for crew members to testify in court proceedings. The alleged near impossibility of doing so to comply with trial subpoenas has been grossly exaggerated and cannot be credited.

There is also no reason why defendants could not employ both the crew member witnesses and the replacement crew aboard a ship at the same time. Indeed, given the minimal wages paid to most crew and the volume of work, some vessel owners and operators choose to staff their vessels with more than the bare minimum that Empire employs for safety, environmental, and quality of life reasons.

At this moment, Empire Bulkers has offered a financial incentive for subpoenaed witnesses not to comply with their subpoenas and has threatened to retaliate against employees who do appear by terminating their employment and withholding wages. The government respectfully submits that this Court has the equitable power to fashion an appropriate order that will put a stop to such tactics and ensure that witnesses employed by the defendant are not financially retaliated against for complying with court orders. While the crew and their attorney were provided ample warning by the Court, and should be held to their obligation because they are not "unavailable" as defined by the law, Empire should be held accountable for acting in bad faith and subverting the express terms and intent of this Court's Order. In effect, the corporate defendants are also seeking a judicial order giving them permission to violate their obligations

under the Security Agreement.[9] Not only did Empire send subpoenaed witnesses to far off destinations knowing of their obligation to be in the district on a date certain, but it did so without making arrangements for their return for a short period of time, and without any notice to the government or the Court.[10] The motion of the witnesses was only made when the United States began making travel arrangements well in advance of trial. This failure to inform the government and the Court also creates an adverse inference regarding the motives of the organizational defendants.

### III. The Rule 15 Depositions

In its opposition to the Motion to Quash, the United States explained that movants lack standing to litigate the admissibility of depositions taken in this matter. Although the witnesses are available because they were served with subpoenas, the effort to have them declared "unavailable" is not only contrary to law, but also would work a failure of justice since unavailability alone will not guarantee that the depositions will be admissible. As mentioned

---

[9] The Security Agreement signed by the organizational defendants provides that "the Owner and Operator agree to cooperate with the United States to arrange for testimony of such employed officer or crewmember before a Grand Jury or other judicial or administrative proceeding arising from the Alleged Violations." *See* Security Agreement attached as Exhibit H at 4. "In addition, the Owner and Operator will encourage these officers and crewmembers to cooperate with the United States in carrying out its investigation and in appearing for their scheduled testimony. Owner and Operator will act in *good faith* in carrying out these obligations. No . . . retaliatory actions will be instituted by the Owner and/or Operator . . . against an officer or crewmember or other employee as a result of the officer's or crewmember's or other employee's cooperation with the United States. No efforts will be undertaken to retaliate against the officers or crewmembers or other employees for their cooperation, either now or at any time in the future, and the Owner and Operator will make reasonable efforts to prevent third parties from doing the same. The United States agrees that it will provide reasonable notice of its need for these officers and crewmembers to be present so that the Owner and Operator may arrange for substitute officers and crewmembers." *Id*. at 4-5 (emphasis added).

[10] It is not presently known what communications may have taken place between the corporate defendants and their counsel and counsel for the witnesses – who are in a joint defense agreement in this case, and who have worked in tandem in numerous other similar matters, as they have continuously advised this Court.

previously, the depositions are a continuous stream of objections and prejudicial remarks. The defendants collectively objected to admission of all or virtually all of the government's exhibits. Most recently, defendant Tan has noticed objections including objections to the authenticity of records seized from the ship and those produced by the organizational defendants. Among the many objections raised by defendant Tan, is the objection to the admission of the official Oil Record Books of the ship containing the signatures of Tan, Third Engineer Cabanayan and Captain Akkaya.

Defendant Tan's challenge to the admissibility of the false record he is charged with making and using, as well as numerous other key documents, demonstrates the need for the crew member witnesses to attend trial so that they may authenticate documents and review entries as may be necessary. Their testimony may also be necessary to overcome other objections raised or that may be raised. In sum, Tan's objections to the government's exhibits, as well as those registered by the corporate defendants during the Rule 15 depositions, are yet another reason why the witnesses need to be present for trial.[11]

This point raises a procedural and logistical problem. Without prior notice, the parties have not reviewed, conferred, redacted or edited the video recordings. This could take weeks if not months. Even worse, given the voluminous objections, the manner in which they were made, and remarks of counsel, it may not be possible. Aside from the logistical problem and unfair burden this process would place on all parties at this late date while preparing for trial, the motion seeks to put the proverbial cart before the horse. Until such time as it is known whether the

---

[11] If availability were a genuine issue, then the least prejudicial remedy to all parties would be to move trial to a date when the witnesses agree to appear. There is simply no basis to excuse witnesses because it is inconvenient or they would rather be elsewhere. If the Court were to adopt such an approach, it could be abused in a wide-range of cases such as those with international witnesses, let alone the cottage industry of vessel pollution defense.

depositions and relevant exhibits can be admitted without prejudice, it is simply premature to quash duly authorized trial subpoenas.

## CONCLUSION

For the reasons set forth in the Government's Opposition to the motion of adverse witnesses to quash trial subpoenas and those set forth in this supplemental opposition to Defendants' joining the motion to quash, the government respectfully requests that the Motion to Quash be denied and, further, that the Court issue an Order to preclude Defendants from imposing any financial penalty on witnesses that it has sought to make unavailable.

The government further requests, respectfully, that the Court endeavor to expedite the resolution of this matter because the trial date is quickly approaching and the logistics for accommodating the return of the foreign witnesses may be complicated.

Respectfully Submitted,

| | |
|---|---|
| TODD KIM | DUANE A. EVANS |
| Assistant Attorney General | United States Attorney |
| Environmental & Natural Resources Division | |
| U.S. Department of Justice | |
| | |
| *s/Richard A. Udell* | *s/ G. Dall Kammer* |
| Richard A. Udell | G. Dall Kammer (26948) |
| Senior Litigation Counsel | Assistant U.S Attorney |
| Environmental Crimes Section | 650 Poydras Street, Suite 1600 |
| U.S. Department of Justice | New Orleans, LA 70130 |
| 50 M St., N.E./Room 4206 | Telephone: (504) 680-3168 |
| Washington, D.C. 20044 | Email: dall.kammer@usdoj.gov |
| Telephone: (202) 305-0361 | |
| Email: richard.udell@usdoj.gov | |

9

**CERTIFICATE OF SERVICE**

    I hereby certify that on April 22, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record.

                                        *s/ G. Dall Kammer*
                                        G. DALL KAMMER
                                        Assistant United States Attorney