UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 21-126** |
| v. | * | **SECTION: S** |
| **EMPIRE BULKERS LTD.** | * | |
| **JOANNA MARITIME LIMITED** | | |
| **WARLITO TAN** | * | |
| | * | |

\* \* \*

**UNITED STATES' RESPONSE IN OPPOSITION
TO TAN'S MOTION FOR INSPECTION**

The United States, through undersigned counsel, respectfully responds to defendant Tan's motion for inspection and testing of the oil content meter at issue in this case. Rec. Doc. 140.[1] Tan has not been denied an opportunity to inspect and test the oil content meter. As detailed below, Tan has repeatedly been offered such an opportunity, has had an expert examine the equipment, but claims that he cannot conduct undetermined tests on it unless he can take exclusive possession of this essential piece of government evidence without the government's ability to ensure that the integrity of the evidence remains intact. Tan's unreasonable request should be denied because it falls well outside the requirements of Rule 16.

**I.      The Oil Content Meter**

During the course of normal operation, large vessels routinely generate oil-contaminated bilge wastewater. This wastewater is generated when water in the bottom of the vessel (known as the bilge) mixes with oil that has leaked and dripped from the machinery, lubrication, and fuel

---

[1] On April 26, 2022, corporate defendants joined this motion. *See* Rec. Doc. 151.

system for the engines. MARPOL[2] prohibits the discharge of such oily mixtures except where: (a) the oily mixture is processed through approved oil filtering equipment; and (b) the oil content of the effluent *without dilution* ultimately discharged into the sea does not exceed 15 parts per million (ppm). In practice, prior to discharge, oily mixtures are processed through a pollution control device known as an Oily Water Separator (OWS) which separates water from oil. Processing is monitored by a device connected to the OWS known as an Oil Content Meter (OCM). This device senses the amount of oil remaining in the effluent after processing by the OWS. If the OCM detects an oil content of greater than 15 ppm as measured by the opacity of the effluent, then it sounds an alarm, shuts down the pumps, and/or diverts flow back to the bilges in order to prevent the discharge into the sea of oil in an amount greater than 15 ppm. The design of this system is regulated by MARPOL. Specifically, MARPOL Annex I, regulation 14 specifies that oil filtering equipment must be provided with arrangements to ensure that any discharge of oily mixtures is automatically stopped when oil content of the effluent exceeds 15 ppm. In order to prevent discharges greater than 15 ppm, and in order to assure that the sampling of the discharge is accurately sampled and monitored, MARPOL and the regulations promulgated under APPS prohibit any dilution of the sample that passes through the OCM.

In this matter, the Coast Guard discovered a modification to the sample line valve handle for the OCM which had occurred at some point prior to the vessel's arrival in New Orleans. A Coast Guard inspector noticed that the valve handle did not turn all the way to the left as designed to prevent fresh water from diluting the effluent sample. *See* OCM Photo attached as Exhibit A. Upon removing the cover of the valve handle, the inspector noticed a modification that consisted

---

[2] The legal background of MARPOL is set forth in the government's opposition to the defendants' motion to dismiss count 1.  *See* Rec. Doc. 75 at 2-5.

2

of a trapezoidal metal plate that was welded onto the valve handle and behind a cover plate. *See* photo attached as Exhibit B. This inserted piece of metal defeated the design of the valve which was intended to prevent fresh water from flushing the Oil Content Meter during an overboard discharge. Instead, the valve handle was able to both discharge and flush the sensor with fresh water at the same time thus preventing the sensor from analyzing a true sample of the overboard effluent.

## II. Discovery

The OCM has been available for inspection by the defendants for many months. Only on March 24, 2022 did Tan inquire about the availability of the equipment for inspection and testing. *See* Exhibit C at 2. The next day, the government reminded Tan that the equipment had always been available for inspection, and that the government would consider a written proposal for any testing. *Id.* at 1. On April 11, 2022, Tan contacted the government about setting up an expert inspection of the OCM the following week. *See* Exhibit D at 5. The next day, the government again reminded Tan that if he wanted to test the device, a written proposal should be submitted. *Id.* at 4. Tan then requested that his then-unnamed expert be allowed to take the OCM out of government custody for an undetermined period of days, to an unknown (other than "his office")[3] and thus, unsecure location, and without disclosing what tests would be performed on this original and crucial piece of tangible evidence. *Id*.

On Tuesday, April 12, 2022, Tan proposed that his expert inspect and conduct tests on the OCM the following Monday, April 18, 2022. The government arranged for inspection of the OCM by Tan's expert on April 18, 2022, but explained that the government must retain care, custody

---

[3] Tan subsequently identified Mr. Antonis Panagiotareas as his proposed expert, who's offices are in Houston, Texas. The government has since moved to exclude Mr. Panagiotareas' proposed testimony. *See* Rec. Doc. 155.

and control over this essential piece of evidence. *Id*. at 3. The government again offered to consider any written proposals for testing. *Id*. To protect the integrity of the evidence, the government also required that any such testing be done in the presence of a government representative. *Id*. On April 13, 2022, the government again offered to consider any written proposals for testing. *Id*. at 2. Tan's expert inspected the OCM at the Coast Guard Offices on April 18, 2022. Two days later, Tan filed the instant motion.

### III.    Law and Argument

Fed. R. Crim. P. 16(a)(1)(E) requires that the government "must permit the defendant to inspect and to copy or photograph and to copy or photograph" tangible objects if the item is "within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Moreover, Rule 16(a)(1)(F) requires that "the government must permit a defendant to inspect and to copy or photograph the results or reports" of any scientific test. Contrary to Tan's claims, no provision of Rule 16 requires that the government relinquish custody and control of an original piece of evidence to a defendant,[4] or that the government give advanced notice to a defendant before it tests such equipment during a

---

[4] Tan's suggestion that *Yates v. United States*, 135 S. Ct. 1074, 1083 (2015) requires that the government "turn over" original evidence to the defendant takes Justice Sotomayor's ruling wildly out of context. *Yates* concerned whether the term "tangible object" included *fish* for purposes of charging a defendant under 18 U.S.C. § 1519 (obstruction) for destroying evidence of harvesting undersized red grouper. The holding had nothing to do with whether the defendant was entitled to possession of the fish prior to trial. Tan's suggestion that *United States v. Llanez-Garcia*, 735 F.3d 483, 486 (6th Cir. 2013) stands for the proposition that he can "obtain" original evidence is equally misleading. *Llanez-Garcia* concerned sanctions against a federal public defender regarding issuance of Rule 17 subpoenas in an immigration case. The court, giving the background that led to the sanctions, discussed production of copies of agent reports. *Id*. It does not stand for the proposition that a defendant was entitled to exclusive and unmonitored possession of original evidence.

criminal investigation or in preparation for trial. The Rule requires that the government give the defendant an opportunity to "inspect and copy" – which the government has done repeatedly in this matter.

### A. Tan's Request is Untimely

Tan participated in negotiating the Scheduling Order adopted by this Court. Rec. Doc. 123. The United States proposed a scheduling order to defendants on March 17, 2022. Tan agreed to the proposed schedule on March 25, 2022, and it was filed as a consent motion on March 28, 2022. Rec. Doc. 123. The jointly agreed deadline for disclosure of defense expert testimony was April 18, 2022 – the same day Tan finally got around to inspecting the OCM for the first time. Tan agreed to this schedule knowing that he had not yet inspected the OCM or determined whether any testing of it would be worthwhile.

Tan's request to now have exclusive and unsupervised possession of the government's key tangible evidence for fourteen (14) days in the weeks immediately preceding trial is as unreasonable as it is untimely. Besides being inappropriate to deprive the government of its main evidence right before trial,[5] any expert disclosure of tests Tan might devise are late and would not be admissible. The parties agreed upon dates for such disclosure so that all parties would have an opportunity to consider and respond before trial. Should Tan produce such information shortly before trial, the government will object, move to exclude, and/or seek a continuance if necessary.

If Tan wanted to test the original equipment, then he should have made inquiries to do so months ago when there would be ample time to design a non-destructive protocol, seek

---

[5] As part of its case-in-chief, the government intends to display the OCM to the jury and conduct a test of the manipulated OCM live in court. The government will need substantial time to prepare this presentation with the original equipment.

government approval (and Court approval if necessary), and make appropriate and timely disclosures to the United States as required by the Rules.[6] The schedule for any testing could also have been addressed prior to entering into the Scheduling Order.

      **B.      The Government Offered a Reasonable Compromise**

Despite the fact that Tan's request is untimely, the United States proposed a reasonable compromise to allow defense testing of the original OCM, so long as a non-destructive test protocol was disclosed in advance and that the testing was performed in the presence of government personnel.

The government intends to demonstrate the operation of the original OCM and conduct the same test for the jury that has been disclosed to the defense. Accordingly, the United States has a particularly strong interest in maintaining a chain of custody over this evidence and ensuring that the device appears in Court as it did at the time of its seizure. The OCM is very different from the narcotics evidence in the cases cited by the defendant. In those cases, the government could give the defendant a small sample of the narcotics for testing without compromising the integrity of its evidence or its case-in-chief. Such is not the case with a piece of machinery such as the OCM.

If the Court were inclined to allow Tan to perform testing on the original evidence (to which he is not entitled under Rule 16), then he should be required to inform the government (and

---

[6] The United States is somewhat mystified by this dispute. Heretofore, Tan's counsel has never questioned the impact of the metal insert that is tack-welded inside the OCM valve handle assembly. To the contrary, this was thought to be undisputed. Rather, the government understood Tan's defense to be that he denied knowing of its presence on the ship. As recently as today, in describing Tan's defense to Judge van Meerveld in a related motions hearing, Tan's counsel again explained that the defense theory was that Tan claims he did not know that the valve had been modified.

the Court) in detail of those plans and the testing protocol, and to conduct any such tests with Coast Guard representatives present to ensure that the OCM is not damaged, altered, or destroyed.[7]

## CONCLUSION

For the foregoing reasons, Tan's motion should be denied.

                                                                            Respectfully Submitted,

| | |
|---|---|
| TODD KIM | DUANE A. EVANS |
| Assistant Attorney General | United States Attorney |
| Environmental & Natural Resources Division | |
| U.S. Department of Justice | |
| | |
| *s/Richard A. Udell* | *s/ G. Dall Kammer* |
| Richard A. Udell | G. Dall Kammer (26948) |
| Senior Litigation Counsel | Assistant U.S Attorney |
| Environmental Crimes Section | 650 Poydras Street, Suite 1600 |
| U.S. Department of Justice | New Orleans, LA 70130 |
| 50 M St., N.E./Room 4206 | Telephone: (504) 680-3168 |
| Washington, D.C. 20044 | Email: dall.kammer@usdoj.gov |
| Telephone: (202) 305-0361 | |
| Email: richard.udell@usdoj.gov | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all defense counsel of record.

                                                                            *s/ G. Dall Kammer*
                                                                            G. DALL KAMMER
                                                                            Assistant United States Attorney

---

[7] The government has never suggested that it be privy to communications between Tan, his legal counsel, and his expert. If such confidential communications are necessary during any testing, then arrangements can certainly be made for the defense team to speak in private.