**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 21-126** |
| **v.** | * | **SECTION: S** |
| **EMPIRE BULKERS LTD** | * | |
| | * * * | |

**JOINT MEMORANDUM REGARDING REVOCATION DISPUTES**

Pursuant to this Court's August 23, 2024 Order (Rec. Doc. 367), the parties provide the following specifics regarding their positions on contested facts in the four violations alleged in the Rule to Revoke and Amended Rule to Revoke. Rec. Doc. 356 and Letter from Probation to the Court Feb. 12, 2024. There are four alleged violations of probation. Each alleges a violation of ECP.

**A. Preliminary Statement by United States**

The United States supports the four alleged violations of probation and sets forth below the facts that it will introduce at the hearing and/or with evidentiary submissions. In compliance with the Court's Order, Doc. 367, the United States sets forth below the underlying facts that it will establish at the hearing in support of each violation. The government intends to do this with the submission of written materials and the testimony of the Court Appointed Monitor selected to assist the supervision of probation in this matter.

Consistent with the plea agreement, the Court's Judgment dated January 23, 2022, sentenced the defendants to pay a criminal fine and to a term of probation of four years subject to standard and special conditions of probation, to include:

> 1.      The defendants shall commit no further violations of MARPOL 73/78, federal, state, or local law, and shall conduct all operations in accordance with the environmental laws of the United States.
>
> And
>
> 4.      At its own expense, and at no expense to the government or the court, Empire Bulkers Ltd. shall adopt and implement an Environmental Compliance Plan (ECP) subject to review by the United States and consistent with USSG §8D1.4. Any vessel covered by the ECP and all shoreside offices involved in technical management must be audited by an outside and independent auditor subject to approval by the Court and the United States (Third Party Auditor (TPA)). An independent Court Appointed Monitor (CAM) subject to approval by the United States will be appointed to review and audit results, assure overall compliance, and report to the Court. All audits must be done underway and each vessel must be audited at least twice during the period of probation unless the TPA or the CAM recommends additional audits.

The plea agreement also included the requirement that Empire Bulkers adopt and implement an ECP subject to review and approval by the United States and consistent with USSG §8D1.4. The ECP was negotiated between the parties and made a part of the plea agreement. Rec. Doc. 214.

The highly technical nature of a specialized industry have led the Department of Justice to require external supervision to serve as an independent source of information for the Court and Office of Probation. The selection and role of CAM and TPA, sometimes combined into a single entity, is common in white collar prosecutions, and routine in environmental crimes prosecutions, including vessel pollution cases. While paid by the defendant, the CAM and TPA are independent and intended to serve as the Court's eyes and ears and to assist the Office of Probation. It is undisputed that the ECP, and the role of the CAM/TPA, are part of the sentence in this case.

Pursuant to the ECP, and as relevant to the alleged violations of probation, Empire was required to designate a Corporate Compliance Manager ("CCM") who, among other things, was tasked with nothing less than implementing the ECP. *See* Rec. Doc. 214-1 (ECP) at 7-9. The Corporate Structure and Responsibilities chapter of the ECP requires that the CCM "shall report

directly to the Managing Director of Empire (the "Empire MD"). *Id*. at 7. Under the subheading Corporate Accountability, the CCM is required to make quarterly reports to the Empire MD concerning compliance with and implementation of the ECP. *Id*. at 10.

Defendant nominated a slate of candidates for the position of CAM and another for TPA. The government accepted ECM Maritime (ECM) to serve as the CAM but rejected the defendant's proposals for TPA. Rather than submit a new slate of TPA candidates, the defendant asked if the government would accept ECM to serve as both CAM and TPA (hereinafter CAM/TPA). The government agreed. The United States does not agree with defendant's characterization now, or its relevance, that one person (Michael Minogue was the CAM and another person, Nish Kapoor was the TPA). No separate designation was ever made as to the role of two persons within the same company. Defendant proposed that the same entity perform both functions, something that presumably saved it some expense, and it has never complained to the Court or to the government as it seems to be doing now. In approximately June, ECM was subsequently acquired by Gallagher Marine. Mr. Minogue continued to be involved in the supervision of probation until December 2023 when he retired. Mr. Kapoor, who is a highly experienced master mariner and auditor, has served as CAM and/or TPA in many prior cases. He has served throughout in the role of CAM and TPA, assisted by the staff of ECM and now Gallagher Marine. The government is unaware of any relevance to the representations made in defendant's footnote 2 and also believes that some are inaccurate. Also irrelevant, but concerning, is the unfortunate but inevitable suggestion in defendant's preliminary statement that it is somehow less culpable either because it is guilty by and through the acts and omissions of its employees and agents, acting for the benefit of the company, or because it was sentenced by this Court "[n]otwithstanding" the fact that the individual was acquitted.

### B. Preliminary Statement by Organizational Defendant

The Organizational Defendant, Empire Bulkers Ltd ("Organizational Defendant" or "Empire"), a lawful business with its principal place of business in Athens, Greece, contests the allegations that it violated probation and further submits that the facts and evidence will establish that there have been no violations of any conditions of probation entered by the Court. (Rec. Doc. 333). In further support and in response to advocacy presented by the government in this submission, Organizational Defendant respectfully submits the following.

On March 11, 2021, (*i.e.* – over forty-one (41) months ago), the M/V JOANNA arrived in the port of New Orleans. Following a U.S. Coast Guard Port State Control inspection, the Vessel's departure clearance was withheld on the suspicion that "its owner, operator, or person in charge may be subject to a fine or civil penalty under the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. Chapter 33, and regulations prescribed under APPS at 33 C.F.R. Subchapter O." Various proceedings were held before the Court including Rule 15 depositions of six (6) crewmembers pursuant to an Order by Magistrate Judge van Meerveld. *See* 21-mc-592. The Organizational Defendant was charged with four (4) felonies strictly on the basis of a theory of vicarious responsibility for (mis)conduct the prosecution attributed to the Vessel's Chief Engineer, Warlito Tan. (Rec. Doc. 1). The Organizational Defendant and the government reached an amicable resolution on or about May 20, 2022, which was memorialized with the Court on May 24, 2022. (Rec. Doc. 216, 219). On a parallel path, the individual defendant, Chief Tan, maintained his innocence and elected to proceed to trial, which Your Honor presided over. On November 16, 2022, a jury acquitted Chief Tan on all four (4) counts brought against him. (Rec. Doc. 317). Notwithstanding, Organizational Defendant was sentenced and judgment entered by the Court on January 19, 2023. (Rec. Doc. 332, 333).

During plea negotiations with the government, Empire shared the remedial measures it had voluntarily undertaken and implemented following the detention of the M/V JOANNA at New Orleans.   In addition, by September 2021, Organizational Defendant had developed a robust Environmental Compliance Manual (developed utilizing publicly available environmental compliance plans imposed by Courts in similar but unrelated cases). Once the Environmental Compliance Plan ("ECP") was entered in this matter, Organizational Defendant updated the draft Environmental Compliance Manual accordingly.  Organizational Defendant provided the prosecutors the voluntary environmental audits it had commissioned by an independent third party, Gallagher Marine Services[1] throughout 2021 and early 2022. Notably, the government credited seven (7) audits performed prior to the entry of the Plea Agreement towards Organizational Defendant's audit requirements. (Rec. Doc. 216-1, Attachment 6).

During the twelve (12) months which elapsed between the date the Court entered the plea agreement and the date the Court Appointed Monitor ("CAM") and Third Party Auditor ("TPA"), were selected by the government[2] on May 23, 2023, Organizational Defendant continued to have

---

[1] During the pendency of this matter, Gallagher Marine Services acquired ECM Maritime Services, which was learned by Organizational Defendant from Gallagher (not ECM) in July 2023.

[2] Michael Minogue (former CEO of ECM Maritime Services) and Nishit Kapoor (ECM Maritime Services) served as CAM and TPA, respectively. Parenthetically, Organizational Defendant had submitted candidates for both roles on January 25, 2023 and the government took seventeen (17) weeks to select ECM Maritime Services. Organizational Defendant is unaware of any submissions by the government seeking Court approval or acceptance of either Mr. Minogue or Mr. Kapoor as the ECP service providers.  The government contends that Nish Kapoor served as both the CAM and TPA since the inception of probation. This is not correct.  The CAM functions were performed by Michael Minogue from inception until the end of December 2023.   Indeed, while the ECP does not expressly prohibit a single entity employing individuals serving in both the CAM and TPA, it is clear that a single individual cannot wear two (2) hats as it includes various checks and balances wherein the CAM is required to monitor and report on, *inter alia*, "inadequacies of the TPA"; "inspect or investigate any aspect of the TPA activities as they relate to the requirement of this plan." *See* 216-1, Section V.D.3-4.   In addition, the required qualifications of the CAM and TPA are completely different. *See e.g.*, *Id*., at Section V.B and Section VI. A, B, and D.   Although not

independent third-party environmental compliance audits performed at its sole cost and expense. Organizational Defendant performed these audits despite the government taking the position no further or additional credit would be provided for voluntary audits.

The compromise reached between the Organizational Defendant and the United States included a fifty-one (51) page ECP drafted and required by the prosecutors (Rec. Doc. 216-1), Pursuant to Section IX of the ECP, one of the very first items to be undertaken was the creation of an Environmental Management System Manual to advise and guide best practices for staff serving aboard vessels operated by the Organizational Defendant. On May 23, 2023, the Organizational Defendant's Environmental Compliance Manual was provided to the CAM and TPA. A copy of the confirmation Email with the Environmental Compliance Manual[3] is enclosed hereto as Defendant Exhibit 1.

As per Section IX.B of the ECP, the CAM had sixty (60) days to review and provide comments on the Environmental Compliance Manual. No comments were received from the CAM (Minogue) or TPA (Kapoor). The Organizational Defendant promptly submitted its Environmental Compliance Manual to the ECP service providers once on the job, which further demonstrates the Company's steadfast commitment to continuous improvement during the fourteen (14) months which followed the detention of the M/V JOANNA.

_____

disclosed to the Organizational Defendant during the period when ECM Maritime Services submitted its proposal to assist with the ECP, it was later learned that the company was in the process of being sold and acquired by Gallagher Marine Services. Mr. Minogue, CEO of ECM Maritime Services, was not offered an opportunity to continue in a similar capacity once the acquisition was complete and, upon information and belief, was given a severance package as part of the termination of his employment. Organizational Defendant has subpoenaed both Mr. Minogue and Mr. Kapoor to appear before this Court, as both possess relevant and probative information.

[3] As part of Organizational Defendant's continuous improvement, ECM is now on Version 7, which was circulated to the CAM and Empire's Fleet of Vessels in June 2024.

Simply put, there were no violations of probation which will become clear through the examination of, *inter alia,* Mr. Minogue, Mr. Kapoor, and the Organizational Defendant's Corporate Compliance Manager, Captain Andreas Fountoulis.[4]  In addition, Organizational Defendant expects to submit various written materials, contemporaneous communications, and other evidence in further support.

## <u>VIOLATION NO. 1 & 2</u>

(1) Empire Bulkers failed to promptly notify the Court Appointed Monitor of all reports of non-compliance received from employees. Empire Bulkers waited approximately 14 days before providing the Court Appointed Monitor with a report that the Chief Engineer of the *M/V Panagiotis* discharged bilge water overboard in violation of MARPOL and the Environmental Compliance Plan.

(2) Empire Bulkers conducted an undisclosed and unilateral investigation, specifically between October 5, 2023 and October 19, 2023, into allegations that the Chief Engineer of the *M/V Panagiotis* committed a deliberate violation of MARPOL and the Environmental Compliance Plan.

A.    <u>BY THE GOVERNMENT</u>:

Violations 1 and 2 are closely related. Both allege noncompliance with the ECP concerning alleged violations of MARPOL involving the *M/V Panagiotis.* Violation 1 concerns the failure to promptly report the alleged violations made by an employee as required by the ECP. *See* ECP Section V.C and Attachment 5. Empire waited approximately 14 days before providing the CAM with a report that the Chief Engineer of the *M/V Panagiotis* had discharged bilge water overboard

---

[4] Undersigned counsel for the Organizational Defendant has previously communicated with the Court about the need for a Greek language interpreter to be present at the proceedings.

in violation of MARPOL and the ECP, and that environmental seals required by the ECP had been removed. Section V of the ECP states: "Empire shall provide the CAM with full access to all offices, records and Covered vessels associated with this ECP. Empire shall further ensure that the CAM is promptly provided with all reports and notifications as established in this plan, as specified in Attachment 5." Attachment 5 provides a list of reports and notifications that must be promptly provided to the CAM, including "Reports of non-compliance received from employees and action taken by the CCM." Violation 2 alleges that the manner in which the defendant conducted its undisclosed and unilateral investigation into the allegations that form the basis of Violation 1 constitute a violation of the ECP. That is true because it undermined and subverted supervision of probation by the CAM.

Absent a stipulation as to the relevant facts, the following will be established at the hearing set for September 5, 2024.

On October 5, 2023, the Second Assistant Engineer (2nd Engineer or 2/E) of the *M/V Panagiotis* alleged that the Chief Engineer had deliberately discharged bilge waste overboard.[5] *See* TQC investigation report, attached as Gov't Exhibit A at 3. The allegation, including links to three videos, were made to Stella Marris, the company that provided crew to the ship. The *M/V Panagiotis* was a vessel covered by the ECP. *Id.*

Without notifying the CAM/TPA, Office of Probation, or the United States, Empire's CCM, Mr. Fountoulis, and a technical expert from Total Quality Consultants ("TQC") – *an outside firm retained by Empire's criminal defense couns*el – traveled to the ship and interviewed crew members and examined ship records between October 10, 2023 and October 16, 2023 while sailing

---

[5] The 2nd Engineer is an officer who is second only to the Chief Engineer and second in command of the engine department and engine room.

from Yeosu, Korea to Gunsan, Korea. *Id.* Criminal defense counsel in this case also conducted interviews with certain crew members. *Id.* at 6. None of these efforts were made with the knowledge or involvement of the CAM/TPA, Office of Probation, or other interested parties.

After the interviews by criminal defense counsel, and prior to any notice to the CAM/TPA, Office of Probation or the United States, all engine department officers and crew were dismissed and debarked the ship. *See* First Annual CAM Report, attached as Gov't Exhibit B at 9-10.

Defendant Empire waited until October 19, 2024 to notify the CAM and the United States of the allegations and apparent violation of probation. *Id.* The notification was made by defense counsel, not Empire's CCM, and it implied that the 2nd Engineer was merely a disgruntled employee. The notification stated:

> Corporate Compliance Manager and DPA, Capt Andreas Fountoulis, promptly mobilized and met the vessel at Korea. He, along with a third-party technical expert from Total Quality Consultants ("TQC") attended on board to, inter alia, gather various shipboard records and data and to observe shipboard conditions as part of a robust investigation of the allegations. Undersigned counsel conducted interviews of the members of the engine department, Master and former C/E Melitante. The interviews concluded a few hours ago and on a parallel path, the technical analysis is continuing. We anticipate a more robust report will be completed in the coming days. In the meantime, attached please find four (4) written statements obtained from Oiler Bautista, Oiler Arrofo, 3/E Cabanayan and Capt Ramirez earlier today.
>
> Notably, during the interviews of 2/E Suguitan, the allegations he presented verbally were inconsistent with his initial notification to Stella Maris. When asked to identify "who" was involved in the purported discharge(s), 2/E Suguitan adamantly refused to provide a response. When asked to provide details of "when," "where" and "how often" untreated bilge water may have been discharged, 2/E Suguitan was unwilling to answer. None of the allegations were corroborated by any other member of the engine department. Instead, all other members of the Engine Department refuted the claims and all persons interviewed, including Capt Ramirez, advised of serious concerns relating to the 2/E's poor job performance and inattention to his duties. Shipboard staff were aware of domestic matters troubling the 2/E and advised of conflicts with the C/E arising from non-performance. Each crew member recounted mistakes made by the 2/E; the most serious of which causing a complete 'black out' of the vessel and all knew that the 2/E was very unhappy with receiving a rating of 7 in a performance review/appraisal by C/E Melitante. All were firm in rejecting allegations of

wrongdoing and several recounted threats of retaliation and/or revenge for receipt of what the 2/E viewed to be a "bad" appraisal.

The CAM made requests for certain records including interviews and records which were not provided and/or not provided promptly. The CCM and TQC investigators only interviewed two employees and the Master. They were unable to interview the Chief Engineer, because he departed the ship prior to their arrival. The promised TQC report was forwarded to the CAM and government on January 10, 2024, although it was dated December 20, 2023.

There is overwhelming evidence that defendant and its Chief Engineer committed deliberate violations of MARPOL including the intentional overboard discharge of bilge waste, failure to maintain an accurate Oil Record Book. In addition to being a violation of Special Condition 4, substantive violations of MARPOL are a violation of Special Condition 1, *see* Rec. Doc. 333 at 4, the express terms of the plea agreement, *see* Rec. Doc. 214 (ECP) at 4 (para. 6(a)) ("Defendants shall commit no further violation of MARPOL.") and Special Condition 4 (compliance with the ECP).

Specifically, the documents gathered by TQC and examined by the CAM show that the bilges were frequently alarming (44 high alarms in a 15-day period) which contradicted the ship's records showing minimal levels. Also, there were no entries in the Oil Record Book that would account for these alarms, nor was there a record of exceptional discharges overboard. TQC also found that three valves in the engine room had broken environmental seals, a uniquely numbered closure required by the ECP to prevent unauthorized overboard discharges. The examination of the engine room also authenticated the video recordings taken by the 2nd Engineer.

The *M/V Panagiotis* was flagged in the Republic of the Marshall Islands which has determined that Empire's Chief Engineer directed or was aware of multiple occasions in which overboard discharges occurred between June 16, 2023 and October 9, 2023, in violation of

MARPOL. The Marshall Islands also found that the Chief Engineer was responsible for, or was aware that, the Oil Record Book contained false and incomplete information for the same time period. *See* Gov't Exhibit C. Like the overboard discharges, the failure to accurately record them in the Oil Record Book is also a violation of MARPOL. *See* MARPOL, Annex I, Reg. 15 & 17. The Marshall Islands registry suspended the Chief Engineer's documents required to sail on a Marshall Island registered ship for 18 months and required him to complete MARPOL training prior to reinstatement.[6] The findings of the Marshall Islands registry are alone probable cause that Empire has committed substantive violations of Special Condition 1 (no further violations of MARPOL) and 4 (ECP compliance), and the plea agreement (no further violations of MARPOL). The government is not aware that Empire has disputed the findings of the flag state. The government further observes that Empire's response below does not address the finding of the Marshall Islands or the overwhelming evidence that Empire violated MARPOL Annex I, Rules 15 and 17, and thereby, Special Condition 1 and the ECP.

The practical effect, if not the intended purpose, of the failure to promptly notify the CAM and the relevant parties of the alleged MARPOL violations, including making the cognizant and responsible crew unavailable, was that it concealed actual violations of MARPOL, undermined the role of the CAM/TPA, and prevented the ability of the CAM/TPA to conduct a thorough and independent investigation. Without the crew present or available, the CAM determined that there was little it could do to investigate the allegations. Although Empire initially blamed the whistleblower, it is now evident that deliberate violations of MARPOL were committed by the

---

[6] This administrative action has no impact on the Chief Engineer's ability to sail on vessels registered in any other country. Nor was any action taken against the defendant, a company based in Greece, by the Marshall Islands which has no criminal sanctions to enforce deliberate violations of MARPOL.

highest level engineering officer on the ship, and further, that the root causes of those violations have not been investigated or determined.[7] Such an understanding and corrective action is a major purpose and goal of supervision both as a condition of probation, the ECP, and the ship's own safety management system required under international law. It is not enough to know that multiple substantive violations occurred over an extended period of time (i.e., they were not an isolated event). Other questions include: Why did ship personnel feel it was necessary to violate MARPOL? Was the ship being deprived of adequate resources to comply with MARPOL? Did supervisory personnel know or should they have known about the violations or otherwise fail to provide adequate supervision and training?

In response, the defendant has argued that its internal Environmental Management System (EMS) only requires that notification of such a violation be made within 14 days of receiving the information. *See* Gov't Exhibit B at 9. In apparent recognition that it did not comply with the ECP requirement for prompt notification, and after Empire was cited with this probation violation, the company sought to amend the ECP to re-define prompt notification to be 14 days. The government rejected this proposed amendment.

The number of days does not appear in dispute, but regardless of the number, the point is that it was not prompt or timely in the view of the Court's monitor because it effectively precluded an independent investigation by anyone other than the defendant and an expert hired by criminal defense counsel. This defeated the purpose of having an independent Third Party Auditor and Court Appointed Monitor.

---

[7] The company's response resulting in blaming the whistleblower and removing him (and others) from the ship may also be violative of the ECP's anti-retaliation provision. Rec. Doc. 214-1 (ECP) at 43.

Empire's response also raises other serious questions about compliance with the ECP requirement that the CAM be provided with full access to all offices, records, and covered vessels. "Empire shall further ensure that the CAM is promptly provided with all reports and notifications as established in this plan, as specified in Attachment 5." Rec. Doc. 214-1 (ECP) at 15. Item #2 in Attachment 5 (Reports and Notifications to be Provided to the Court Appointed Monitor) lists one such category to be "Reports of non-compliance received from employees and action taken by the CCM." *Id*. at 50. The defendant's internal procedures do not trump the ECP or provide any authority for the defendant to unilaterally set delayed timeframes that delay notifying the CAM, TPA, Office of Probation, and the United States of such a serious allegation involving a deliberate act of pollution and falsification of ship records.

B.   <u>BY THE DEFENDANT</u>:

The government contends violations 1 and 2 are closely related. Defendant addresses each of the allegations separately, as they were charged separately and each have distinct facts and circumstances warranting independent consideration by the Court.

1. **Alleged Violation #1 - Empire Bulkers Ltd. Failed to promptly notify the Court Appointed Monitor (CAM) of all reports of non-compliance received from employees. Empire Bulkers waited approximately 14 days before providing the CAM with a report that the Chief Engineer of the M.V. PANAGIOTIS discharged bilge water overboard in violation of MARPOL and the Environment Compliance Plan.**

On October 5, 2023, a Manila based manning agency named Stella Maris, sent an email to the Organizational Defendant's crewing department, advising that an anonymous report had been received about potential (mis)conduct had occurred onboard the M/V PANAGIOTIS.   A copy of that notification is attached as Defendant Exhibit 2.  Captain Fountoulis (in his capacity as Corporate Compliance Manager) received a copy of the notice on or about the same day.  In furtherance of the Organizational Defendant's efforts to comply with industry leading best

practices and because the information provided was insufficient and otherwise not actionable,

Captain Fountoulis traveled to meet the Vessel at its next immediate port of call in Korea on or

about October 10, 2023 to conduct an investigation.[8] This investigation included the assistance of

technical experts from Total Quality Consultants, as well as the preservation of shipboard

documents, records, and other evidence which falls squarely within the U.S. Coast Guard's own

internal guidance for expanded MARPOL examination.

This information included:

1. Copies of ORB Part I dated from October 30,2022 to October 08, 2023
2. IOPP Certificate and Supplement Form A
3. Capacity Plan with Deadweight Scale drawing
4. Piping and Instrument Diagram in Engine Room (manufacturers' manual)
5. Engine Room Tank Sounding Record book (Company's controlled form coded VM-50) with entries recorded from July 10,2023 to October 08,2023.
6. Engine Room excel spreadsheet with entries recorded from July 10, 2023 to October 08, 2023
7. Extraordinary Engine Room Operation-Leakage Log (Company's controlled form) from November 06.2022 to September 30,2023
8. Data from OWS/OCM 15ppm memory card and videos of the OCM
9. High Level Bilge Wells Alarm History from December 01,2022 to October 08,2023
10. Fire and General Service pump operational status from July 10, 2023 to October 08, 2023
11. Engine Room Environmental Tag Log (Company's controlled form) with entries from December 29, 2022 to October 08, 2023
12. Noon Report for the dates High level bilge wells alarms were triggered
13. Daily sludges & Bilges log (Company's controlled form VM-41) from October 18, 2023 to November 28,2023.

In addition, each member of the engine department was requested to provide a written

statement and offered the opportunity to prepare their statement either in their native language or

in English.  Copies of each of those written statements provided by Oiler Mark Bautista, Oiler

Benson Arrofo, Third Engineer Bienvenido Cabayan, and Captain Melvin Ramirez are attached as

---

[8] Captain Fountoulis traveled from Greece to Korea on October 8, 2023 and returned home on October 20, 2023.

Defendant Exhibit 3.  Notably, it was learned that the anonymous report was presented by Second Engineer Mario Suguitan who subsequently refused to prepare a written statement; and refused to cooperate and provide responses to various questions seeking actionable information and a more fulsome explanation of the conduct by other shipboard staff he reported.

On October 19, 2023, Organizational Defendant presented the information learned to the Vessel's Flag Administration.[9]  A copy of that report is attached as Defendant Exhibit 4.  At or about the same time, a report was presented by undersigned counsel to all known ECP notify parties at the instruction of the Corporate Compliance Manager.  A copy is attached as Defendant Exhibit 5.  The Organizational Defendant's Environmental Management System and more specifically its Environmental Compliance Manual (which had been presented to the CAM and TPA five (5) months before), provides in relevant part that the Corporate Compliance Manager must "ensure that reports to Interested Parties are made within fourteen (14) days of receiving information of any non-compliant condition on any vessel, along with any findings and corrective actions." *See* Defendant Exhibit 1.

Organizational Defendant's Environmental Management System and Manual are significant as they provide a clear timeline for the prompt reporting of a non-compliant condition of any Vessel, along with any findings and corrective actions. *Id.*  This is unlike the ECP required by the government which is ambiguous at best. Organizational Defendant strictly complied with the fourteen (14) day notice requirement set out in the Environmental Compliance Manual.  Again, the Environmental Compliance Manual had been sent out for review by the CAM and TPA on

---

[9] The Flag Administration investigation did not conclude any wrongdoing undertaken in the course and scope of the Seafarer's employment or agency and did not conclude any misconduct was performed with the intention to benefit the Organizational Defendant.

May 23, 2024 and went without objection or comment.  Rec. Doc. 216-1, p. 31.  This silence was (and is) acceptance and approval.

The ECP ambiguously requires, "Empire shall further ensure that the CAM is promptly provided with all reports and notifications as established in this plan, as specified in Attachment 5. Rec. Doc. 216-1, Section V.C.[10]  Attachment 5 provides the following:  "Reports of non-compliance received from employees <u>and</u> action taken by the CCM." (emphasis added).  The plain language of the ECP makes clear that the Organizational Defendant's Corporate Compliance Manager must investigate and take remedial action in response to reports of non-compliance, <u>following which</u> a report is to be provided.  There is no requirement for an immediate report to be made.  Indeed, the Department of Justice drafters certainly knew how and could have made the reporting requirement immediate, but did not.  There are at least twelve (12) obligations within the ECP that require the Organizational Defendant or a service provider to take "immediate" action or report an activity "immediately."  An annotated version of the ECP highlighting the other timelines is attached as Defendant Exhibit 6.  A helpful summary chart of the timing requirements is provided at Defendant Exhibit 7.

On January 4, 2024, Organizational Defendant presented a request to the ECP notice parties to amend and clarify the time in which reports set out in ECP Attachment 5 are to be presented.  There was no response by either the CAM or the TPA.  The government refused.  A copy of the relevant communications are attached as Defendant Exhibit 8.

The ECP does not preclude the Organizational Defendant from seeking privileged and/or confidential legal advice and does not require a waiver of attorney-client privilege, work product

---

[10] Traditional principles of *contra proferentem* require any and all ambiguities to be interpreted against the matter, *i.e.* – the government.

privilege, and/or any other available privilege.  The government wrongly alleges that the CAM made requests for certain records, including "interviews and records which were not provided and or not provided promptly."  The evidence and facts will show that the very same evidence the U.S. Coast Guard would gather was collected, preserved, and provided.  In addition, the Organizational Defendant elected to waive privilege and voluntarily provided a copy of the report prepared by experts at Total Quality Consultants to the CAM, and TPA (who in turn provided the report to the DOJ).  The CAM and TPA were provided with robust contact information for all members of the Engineering Department, including home addresses, phone numbers, email addresses, and social media accounts.  No effort was made by the TPA or CAM to  communicate with any member of the engineering department (other than Chief Engineer Melitante and Second Engineer Suguitan). There was no effort to communicate with the Captain of the Vessel; and no effort to collaborate with the investigation performed by the Vessel's Flag Administration.[11]

Organizational Defendant complied with the obligations to conduct an investigation of the anonymous report, to gather information, and to report to the CAM, TPA, and DOJ.  The inherent reasonableness of the fourteen (14) day deadline provided in the Environmental Compliance Manual, is even more apparent when it is compared in context to the U.S. Coast Guard's requirement for reporting non-compliance in the U.S. Coast Guard's Appendix V, Environmental Crimes: Voluntary Disclosure Policy requires "prompt disclosure."  In that Coast Guard Maritime Law Enforcement Manual, the prompt disclosure deadline for submission to the Coast Guard is **twenty-one (21) days** from discovery or report received by the company.  A copy of the USCG Policy is attached as Defendant Exhibit 9, *see* Appendix V.5.b.

---

[11] Any claim or allegation of prejudice by either the CAM or TPA is without merit.

2. **Alleged Violation #2 states - Empire Bulkers conducted an undisclosed and unilateral investigation, specifically between October 5, 2023, and October 19, 2023, into allegations that the Chief Engineer of the M.V. PANAGIOTIS committed a deliberate violation of MARPOL and the Environmental Compliance Plan.**

Alleged Violation #2 fails to identify any specific section or other obligation, which is alleged to have been breached. There is no prohibition on the Organizational Defendant conducting an investigation in the manner/means it deems most appropriate, including with the assistance of counsel and experts. Similarly, there is no requirement for the Organizational Defendant to conduct a joint investigation with the CAM, TPA, or anyone else. Indeed, the government seeks to sidestep these obvious facts by claiming Alleged Violation #1 and #2 are "closely related." In contrast, the ECP provides at Section II.A.9, "The CCM shall review, investigate, and document in a timely fashion reports of non-compliance received from employees and shall initiate, monitor, and document all actions taken as a result of such reports. <u>The CCM shall maintain records of such reports and action taken and shall make them available for review by the TPA and the CAM.</u>" *Id.*, (emphasis added). The Organizational Defendant strictly complied with this obligation.

**VIOLATION NO. 3**

(3) Empire Bulkers refused to accept the Environmental Compliance Plan requirement for the Third-Party Auditor to conduct reviews of shoreside training.

A.    <u>BY THE GOVERNMENT</u>:

Attachment 3 of the ECP sets forth detailed requirements for employee training. Employee training is critical to compliance, crew competence, and corporate culture. It is a core requirement of the ECP and serve the remedial sentencing goals set forth in 18 U.S.C. § 3553. In addition to the detailed requirements of the program, the TPA is tasked with supervision:

18

(8)     The CCM shall provide the TPA with details of environmental training courses provided to their officers and crew at establishments ashore, along with their annual schedule. The TPA shall be required to conduct a review of such courses at a minimum of one training establishment per year during the Initial and Ongoing phases, provided that courses at all the training establishments are reviewed at least once during the first two years of the probation period.

(9)     During the Final phase, the TPA shall conduct a review of training courses offered at the location with the highest number of students, representing the nationality that forms the majority of Empire's shipboard crew.

Rec. Doc 214-1 (ECP) at 46 (Att. 3, para 8-9).

Accordingly, the CAM/TPA has repeatedly sought to be informed of the particulars and to attend defendant's training program in Manila. Empire has declined to provide information and through its counsel objected to the CAM/TPA's attendance. The United States disagrees with defendant's characterization that violation 3 is not ripe, or the unsupported assertion that this probation violation is being pursued in bad faith. The record will show that the CAM/TPA's requests on this issue were responded to by defense counsel on behalf of Empire. Perhaps that is why the defendant cannot find a record of the request. At any rate, this issue has been pending for many months and defendant has done nothing to resolve the dispute.

The plain language of these provisions (e.g., "conduct a review of such courses at a minimum of one training establishment per year") and context (e.g., "conduct a review of training courses offered at the location with the highest number of students") show that the CAM/TPA attendance at training is required. Moreover, the CAM/TPA seeks to observe and evaluate the scope and quality of training provided, including the classroom environment, the knowledge and competence of the instructors, the quality and use of training aides, course materials, use of on-site workshops and evaluations, and one-on-one exchanges with officers and crew. *See* Gov't Exhibit B at 2; *see also* Rec. Doc. 214-1 at 45 (ECP Attachment 3). This is well within the scope

and role of the CAM/TPA as contemplated by the ECP.

The CAM/TPA has informed the parties and the Office of Probation that it cannot perform the task of assisting in the supervision of probation or satisfying this ECP requirement without attending at least one training per year. Empire, through its counsel, has objected, reportedly on the basis of cost. The ECP provides that any failure to pay valid charges for the CAM/TPA, any failure to provide the material support needed to achieve the objectives of the ECP, or failure to provide full unrestricted access to facilities and personnel may be a basis to revoke or modify the defendant's probation. Rec. Doc. 214-1 (ECP) at 6.

Of relevance to Violation 3, the TPA/CAM has noted that a vessel audit of the *M/V Gastone* showed that crew member training and awareness was inadequate, including awareness of sewage treatment, garbage management, and procedures for onboard management of bilge water and sludge. *See* Gov't Exhibit B at 7. This is in addition to the serious violations of MARPOL on the *M/V Panagiotis* set forth above.

B.   <u>BY THE DEFENDANT</u>:

**3. Alleged Violation #3 provides as follows – "Empire Bulkers Ltd. refused to accept the Environmental Compliance Plan requirement for the Third-party Auditor to conduct reviews of shoreside training.**

Alleged Violation #3 presents an unripe issue which is not being pursued in good faith, Organizational Defendant has reviewed its files and has not identified any written request from the TPA to attend specific shore-side training. The question of whether the ECP requires extensive international travel at significant cost to merely observe how a qualified trainer conducts his or her lesson has been the subject of numerous discussions and contemporaneous email exchanges. There can be no meaningful dispute: the ECP does <u>not</u> require in-person attendance.

On numerous occasions, including but not limited to December 6, 2023, the CAM, Michael Minogue expressly admitted that the ECP does not require the in-person attendance by the TPA

(or the CAM) of shore-side training by staff, stating "I know that there is nothing in the ECP that says the auditor must  physically attend at the audit location to conduct the audit of the training." The TPA, Nish Kapoor similarly admitted: "of course it doesn't say in so many words you should fly to wherever and be present when it is happening". . . and … "I know its not written in so many words."  Any contrary testimony to be presented by either witness should not be well-received by the Court.

From the very first "kick-off meeting" (conducted virtually by Zoom) with the CAM and TPA on May 24, 2023, Organizational Defendant made clear its commitment to compliance and sought to collaborate with the CAM and TPA.  Organizational Defendant has provided all training course materials and has made the instructors available for in-person, virtual, and/or telephonic meetings.  The TPA has been repeatedly encouraged to participate in training conducted abroad by virtual, remote connection.  Organizational Defendant is unaware of any effort by the TPA or CAM to review the training material with the trainers and are unaware of any deficiency noted, by any crewmember that had participated in the training.[12]  Attachment 3 to the ECP identifies both the nature and the substance of the annual training to be provided to shipboard staff; none of which being expressly required to be "in person."  Specifically, the ECP provides: "[t]raining may be performed by qualified instructors at a training facility or through Computer Based Training." Rec. Doc. 216-1, Attachment 3, paragraph 2.   Simply put, there is no requirement for in-person training whatsoever and no requirement for any "in person" review of the course materials prescribed at shoreside training.

---

[12] All references by the government to the CAM is misplaced as there is no requirement for the CAM to review any shoreside training.

## VIOLATION NO. 4

(4) Empire Bulkers eliminated without notice or approval the position of Managing Director required under the Environmental Compliance Plan and modified the reporting chain of the Corporate Compliance Manager as required under the Environmental Compliance Plan.

A.    <u>BY THE GOVERNMENT</u>:

On December 28, 2023, the Court Appointed Monitor/Third Party Auditor submitted a report to the Office of Probation and the Interested Parties with the results of the Initial Audit of Shore Side Operations conducted at Defendant's headquarters in Athens, Greece on December 13-14, 2023. One of the non-conformities identified by the shore-side audit was that Empire had made an unannounced and unapproved change to the corporate structure that differs from that specified in the ECP.

As set forth above, the ECP set out a corporate structure to ensure that compliance matters were reported by the CCM to the Managing Director.  However, during the December 2023 audit, the TPA/CAM discovered that the position of Managing Director had been eliminated or vacant since June 2023. No replacement had been made. Instead, the duties and responsibilities of the Managing Director had been assigned to a group of mid-level managers who are at the same level of the company as the CCM. *See* Gov't Exhibit B at 5. This modification of the corporate structure amended the chain of command and lines of internal reporting required by Section II.A and II.B of the Environmental Compliance plan. The change affects the reporting of the CCM as well as the Heath Safety Quality Environment Manager ("HSQEM"), both of which were also required by the ECP to report directly to the Managing Director. Instead, both the CCM and HSQEM now report to the committee on which they themselves sit. Further, Defendant had no organizational chart to show the new structure, or the responsibilities and functions of personnel involved in

implementing the ECP. Accordingly, the TPA/CAM was unable to determine whether the CCM and/or HSQEM are actually reporting directly to highest levels of the corporation thereby defeating the accountability that was set forth in the ECP. Defendant's submission represents, apparently for the first time, that Mr. Fountoulis has "direct access to the Corporate Director and Shareholder of the company, Vasileios Koutsolakos." Mr. Koutsolakos does not appear on the organizational chart provided to the CAM/TPA and has no known operational or other role in management of the company.

The parties appear to agree that the corporate structure was changed without notice. There is no record of Empire informing the CAM/TPA, the Office of Probation, or the United States. Proposed changes to the ECP may be made, but there is a required process that requires that changes must be proposed in writing, signed by a corporate representative, and submitted to the government which has a 30-day period to object/respond. *See* Rec. Doc. 214-1 (ECP) at 7 (para. H). The parties disagree whether this change and departure from the reporting lines set forth in the ECP needed to be reported to the CAM/TPA, Office of Probation and the government. In addition to the procedural violation, is the apparent substantive violation concerning no clearly defined accountability from the mid-level managers to those who own, manage and control the company.

B.      BY THE DEFENDANT:

4.  **Alleged Violation #4 - Empire Bulkers eliminated without notice or approval the position of Managing Director required under the Environmental Compliance Plan, and modified the reporting chain of the Corporate Compliance Manager as required under the Environmental Compliance Plan**

This Alleged Violation is similarly misplaced.  Section 2 of the ECP is titled Corporate Structure and Responsibilities.  At the time the ECP was submitted to the Court, the Organizational Defendant had an employee titled: Managing Director.  This individual left Empire Bulkers on or about June 30, 2023.  The government pejoratively (and without support) argues the duties and

responsibilities of the Managing Director had been assigned to a group of "Mid-Level Managers." The ECP is silent on what to do when/if there is a the Managing Director were to leave the company and has no requirement for staff changes to be either reported or approved by the CAM, TPA, or anyone else.

Similarly, the ECP is silent as to the role and/or responsibilities of the Managing Director position.  Instead, Section II.A sets out in detail the responsibilities and obligation of the Corporate Compliance Manager, all of which having been performed by Captain Fountoulis in an exemplary manner.  It is anticipated Captain Fountoulis will explain that upon the departure of the Managing Director, a committee of senior executives, comprised of the senior most personnel in each department within the corporation, was convened to ensure a robust set of "checks and balances" and to ensure fulsome knowledge and timely action when necessary throughout the entire organization.  At all times, Captain Fountoulis had (and has) direct access to the Corporate Director and Shareholder of the company, Vasileios Koutsolakos.  Again, the ECP does not require access to the very top management of the company, which Captain Fountoulis holds.

The government raises herein additional argument concerning reporting requirements in Section II.B and a graphically depicted organization chart. Notwithstanding the absence of any such requirement, prompt remedial action was taken and an organizational chart was provided to the TPA on February 26, 2024.  Six (6) months later, no questions, comments or objections have been received from the TPA or CAM.

For the reasons set forth above and in accordance with what will be presented before the Court on September 4, 2024.  Organizational Defendant respectfully submits that there have not been any violations of probation.  Instead, the evidence will show that the Organizational Defendant has taken very seriously all obligations set out in the parties prior plea agreement and

in the ECP and is committed to continuous improvement in an effective, time, and cost-efficient manner. To the extent not expressly stated above or not addressed herein, the Organizational Defendant reserves the right to contest any and all factual allegation(s) presented by the government herein.

Respectfully Submitted,

TODD KIM
Assistant Attorney General
Environmental & Natural Resources Division
U.S. Department of Justice

DUANE A. EVANS
United States Attorney


*s/Richard A. Udell*
Richard A. Udell
Senior Litigation Counsel
Environmental Crimes Section
U.S. Department of Justice
50 M St., N.E./Room 4206
Washington, D.C. 20044
Telephone: (202) 305-0361
Email: richard.udell@usdoj.gov

*s/ G. Dall Kammer*
G. Dall Kammer (26948)
Assistant U.S Attorney
650 Poydras Street, Suite 1600
New Orleans, LA 70130
Telephone: (504) 680-3168
Email:dall.kammer@usdoj.gov


CHALOS & CO, P.C.

BARRY ROME & SCOTT

/s/ George M. Chalos
George M. Chalos, Esq.
Briton P. Sparkman, Esq.
55 Hamilton Avenue
Oyster Bay, New York 11771
Telephone: (516) 714-4300
Email:  gmc@chaloslaw.com
        bsparkman@chaloslaw.com

/s/ Daphne P. McNutt
Daphne P. McNutt (#20292)
612 Gravier Street
New Orleans, LA 70130
Telephone: (504) 525-5553
Email: dbarry@barryrome.com

*Counsel for Defendant*
Empire Bulkers Ltd.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to counsel for defendant.

*/s/ G. Dall Kammer*

G. DALL KAMMER
Assistant United States Attorney
