# US v Empire Bulkers Ltd. ECP
# Hearing to Revoke Probation
# United States District Court, Eastern District of Louisiana

**Special Conditions A – D: Chronology of events leading to each Condition**

| Special Condition | Chronology of Events | Supporting Documentation | CAM Concerns |
|---|---|---|---|
| **A. Empire Bulkers failed to promptly notify the Court Appointed Monitor of all reports of non-compliance received from employees. Empire Bulkers waited approximately 14 days before providing the Court Appointed Monitor with a report that the Chief Engineer of the *M/V Panagiotis* discharged bilge water overboard in violation of MARPOL and the Environmental Compliance Plan.** | 1) 10/19/2023: Received email sent by Empire Bulkers attorney Mr. George Chalos to CAM + TPA, Interested Parties (except USPO) and flag administration regarding a report of an alleged Marpol violation aboard the covered vessel M/V Panagiotis.<br>• The report was made on 10/5/2023 by the vessel's 2nd Engineer to his crewing agency in Manila, Stella Marris. The report was not sent to Empire's Corporate Compliance Manager (CCM) via the Company's Open Reporting System, despite the system allowing for anonymous reporting. On receipt of the report, Stella Marris notified Empire the same day. The report included a link to three videos showing a vessel's machinery spaces, with portable pumping equipment rigged and a sizeable amount of liquid in the bilges.<br>• Appended to the report were copies of statements obtained by Empire's attorney from the Master, 3rd Engineer and two Oilers.<br>• Also included was a copy of an email sent on 10/19/2023 by Empire's HSQE-Vetting Marine Manager to the vessel's flag | 1) Doc #1 (Email) | 1) Failure by Empire to notify the CAM promptly, as required under ECP Section V.C and Attachment 5 point #2.<br>First notification received 14 days after the alleged violation was reported to Empire. |

| | | | |
|---|---|---|---|
| | administration (Marshall Islands), notifying them of the same report. This email also stated that all the engine crew had been disembarked from the vessel.<br><br>**2) 10/20/2023 & 10/23/2023**: We (CAM) contacted the government (DOJ) in accordance with ECP Section V.D(4) and discussed the information provided, as well as the inability of the CAM to investigate the reported incident, since Empire had signed off all the engine crew from the vessel and sent them home. The conversations with the DOJ were over the phone and MS Teams.<br><br>**3) 10/24/2023**: We (CAM) wrote back to the CCM regarding the email notification received from their attorney about the alleged Marpol violation. We requested copies of several documents and records including ORB entries, sounding logs, contact details for Engine Room personnel, the inspection report from TQC (external party appointed by Empire's attorney to conduct a shipboard investigation), etc. This information was provided over a period of time, beginning in November 2023. The report from TQC was received on January 10, 2024. | 3) Doc #2 (Email) | |

## TIMELINE (SPECIAL CONDITION A)

| October 5, 2023 | October 5 – October 19, 2023 | October 19, 2023 | October 20, 2023 | October 23, 2023 | October 24, 2023 |
|---|---|---|---|---|---|
| Empire received notification of Marpol violation aboard MV PANAGIOTIS, from manning agency in Manila | **No notification to CAM or Interested Parties**<br><br>**Unilateral investigation conducted by Empire, their attorney and TQC, after which all engine room personnel were off-signed and repatriated** | Empire attorney notified flag admin, CAM, TPA and Interested Parties of the incident and investigation | CAM + TPA conferred with government | CAM + TPA conferred with government | CAM wrote to Empire CCM in response to the notification, requesting several records and documents |

| Special Condition | Chronology of Events | Supporting Documentation | CAM Concerns |
|---|---|---|---|
| **B. Empire Bulkers conducted an undisclosed and unilateral investigation, specifically between October 5, 2023 and October 19, 2023, into allegations that the Chief Engineer of the *M/V Panagiotis* committed a deliberate violation of MARPOL and the Environmental Compliance Plan.** | **1) 10/20/2023 & 10/23/2023**: We (CAM) contacted the government (DOJ) in accordance with ECP Section V.D(4) and discussed the information provided, as well as our inability as CAM to effectively investigate the reported incident, since Empire had signed off all the engine crew from the vessel and sent them home. The conversations with the DOJ were over the phone and MS Teams.<br><br>**2) 10/27/2023**: At CAM's request, contact details for all offsigned engine crew were received from CCM.<br><br>**3) 11/20/2023 & 11/21/2023**: Phone calls made by the CAM to Chief Engineer and 2nd Engineer went unanswered.<br><br>**4) 12/11/2023**: Email sent by CAM to 2nd Engineer, asking about his availability to discuss the alleged violation. No reply received.<br><br>**5) 1/4/2024**: Follow up enquiry by CAM to CCM, enquiring about whereabouts and availability of the Chief and 2nd Engineers.<br><br>**6) 1/10/2024**: Received inspection analysis and report from Total Quality Consultants (TQC) Athens, Greece, who were appointed by Empire's attorney as third-party investigators into the reported violation. We (CAM) had concerns with TQCs findings in three key areas (interviews with engine dept personnel, | 2) Doc #3<br><br><br><br><br><br><br><br><br><br>4) Doc #4 (Email)<br><br><br><br>5) Doc #5 (Email)<br><br><br><br>6) Doc #10 (Report) | Due to the inordinate delay in notifying us (CAM), we were unable to conduct any kind of effective investigation into the reported violation.<br><br>It was noted from Empire's initial email that their attorney interviewed the Master, Chief Engineer and members of the engine department. We were provided with statements from only the following four staff, i.e. the Master and three engine department personnel.<br><br>1) Capt. Melvin Ramirez – Master<br>2) Dinero Cabanayan – Third Engineer<br>3) Mark Baulista – Oiler<br>4) Bensen Arrofo - Oiler<br><br>Note: The engine department aboard this vessel reportedly consisted of eight personnel.<br><br>Separately, TQC interviewed two engine dept. personnel, as per their report:<br><br>a) Mario Suguitan - 2nd Engineer<br>b) Mark Baulista – Oiler<br><br>**We have not been provided details of the interview Empire's attorney conducted aboard the vessel with Chief Engineer Melitante, despite making enquiries to that effect. Also, no reason has been given** |

| | | | |
|---|---|---|---|
| …Contd. | maintenance and record-keeping of seals and frequent activation of engine room bilge high level alarms). These queries were sent to the CCM for Empire's response.<br><br>7) 1/11/2024: Response to (5) received from CCM, saying both officers had left the company.<br><br>8) 1/17/2024: Received the CCM's replies to (6), none of which satisfactorily addressed our questions.<br><br>9) 1/26/2024: Follow up from CAM with available contact details of Chief and 2nd Engineers, as well as known location/schedule of other off-signed engine room crew.<br><br>10) 1/26/2024<br>• CAM attempted calling both Chief and Second Engineers over the phone, no response.<br>• Email sent by CAM to both Chief and Second Engineers, asking about their availability for a phone call or online meeting. No reply received.<br><br>11) 2/19/2024: Asked Empire's attorney if summaries were available from interviews conducted aboard the Panagiotis during their investigation, since the original notification only included Statements from the Master, 2nd Engineer and two Oilers. Attorney responded that no other interview summaries had been prepared. | 7) Doc #6 (Email)<br><br>8) Doc #9 (Email)<br><br>9) Doc #6 (Email)<br><br>10) Doc #7 (Email)<br>Doc #8 (Email)<br><br>11) Doc #11 (Email)<br>Doc #31 (Email) | **as to why TQC only commenced their investigation on October 10, 2023, a day <u>after</u> the Chief Engineer was disembarked from the vessel. As a result, we have no details of any interviews with the Chief Engineer, who was the person alleged to have committed the Marpol violation.**<br><br>Had we (CAM) had the opportunity, our investigation following such an incident would have involved boarding the vessel at the first opportunity (as Empire did, with their attorney) and interviewing the Master, Chief Engineer, Chief Officer, 2nd Engineer, engine department officers and ratings, as well as any additional crew that were in a position to offer information on engine room operations as well as personal interaction aboard the vessel. A full EMS audit of engine room operations and record-keeping would have been carried out, to evaluate the veracity of the 2nd Engineer's allegations.<br><br>However, we (CAM) were only advised 14 days after the report was received by Empire. **By that time, Empire and their attorney as well as TQC had completed a unilateral investigation on board, with no involvement from the CAM, TPA, Court, DOJ or USCG.** In addition, all the engine crew present on board during the reported violation had been off-signed and sent home by Empire, thus preventing the CAM from conducting any kind of effective investigation in the future. Since Empire |

| | | | |
|---|---|---|---|
| …Contd. | **12) 3/6/2024**: CAM/TPA contacted the vessel's flag administration (Marshall Islands) for any available information regarding the vessel's Chief Engineer Mr. Melitante, since the flag administration had initiated an independent investigation into the officer's conduct. A copy of their investigation report was requested.<br><br>The Marshall Islands flag administration confirmed on 3/7/2024 that they had been unable to contact the Chief Engineer and would be moving to close their investigation, after which their report could be obtained from Empire's attorneys.<br><br>**13) 3/11/2024**: Received copy of flag administration report from Empire's attorneys.<br><br>The report drew the following conclusions:<br><br>*While serving as Chief Engineer aboard the MV Panagiotis:*<br><br>*a) Mr. Melitante directed, or was aware of, the overboard discharge of untreated Engine Room bilge water using either the ship's Fire and General Service pump or the Fire and Ballast Water pump on multiple occasions between 16 June 2023 and 9 October 2023 in violation of MARPOL, Annex I, Regulation 15; and*<br><br>*b) Was responsible for, or was aware that, the Oil Record Book Part I contained inaccurate or incomplete information for the period 16 June* | 12) Doc #19 (Email)<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>13) Doc #20 (Email and report) | employs crew on a contractual basis aboard this vessel, the crew members are under no obligation to follow Empire's instructions after signing off from their vessels. This was obvious from the lack of response to our (CAM) phone calls and email to the Chief and 2nd Engineers, which have gone unanswered. Even the vessel's flag administration was unable to establish contact with the Chief Engineer after he was off-signed.<br><br>The report submitted by TQC (third party inspectors appointed by Empire's attorney), received on January 10, 2024 confirmed that the videos submitted by the 2nd Engineer had been taken aboard the MV Panagiotis. As described therein, *the valves/piping shown in the videos were physically verified to be the same as those on board. The videos also correlated with relevant pages from the Engine Room Piping Diagram as well as the actual conditions in the Engine Room.*<br><br>In addition, the report from TQC highlighted three significant areas of concern for the CAM, as mentioned below:<br><br>**i) Crew interviews**: Despite spending 6-7 days aboard the vessel, the TQC investigator only interviewed two engine department personnel, the 2nd Engineer and Oiler Baulista (see earlier comment). The Chief Engineer, against whom the allegations had been made by the 2nd Engineer, could not be |



| | | | |
|---|---|---|---|
| …Contd. | *2023 and 9 October 2023 in violation of MARPOL, Annex I, Regulation 17.*<br>Based on the above determination, the Marshall Islands Administrative Review Board ordered that:<br><br>*i) The Republic of Marshall Islands seafarer documentation held by Mr. Melitante be suspended for a period of 18 months, and*<br><br>*ii) Mr. Melitante provide evidence of successfully completing a MARPOL Annex I compliance course prior to applying for the reinstatement of his Republic of Marshall Islands seafarer documentation.* | …Contd. | interviewed by TQC since he was off-signed on October 9, 2023, a day before TQC boarded the vessel. When asked about this, the CCM advised us that other staff were interviewed by Empire's attorney (his January 17, 2024 email stated that "*The engine crew and Master were interviewed by the attorney appointed by the owner and Empire, George Chalos, Esq.*"). We found it surprising that the Chief Engineer would not have been kept on board to participate in TQC's investigation into this reported violation.<br>**Note**: We were later advised that Empire's attorney did not prepare a summary of his interview with the Chief Engineer. We therefore have no knowledge of the Chief Engineer's version of events, despite him being the person described as being responsible for the alleged Marpol violation.<br><br>**ii) Engine room environmental seals**: The TQC investigator found that three valves had their second seals broken, which had been placed to prevent the valve wheels from being operated/turned. The first two valves were emergency direct bilge suction valves, and the third was a suction valve from the bilge holding tank. None of the seal numbers in place tallied with the vessel or office records, indicating that the original seals had been removed and replaced in the past, without this activity being recorded or reported to the office. The CCM had no |

| | | | |
|---|---|---|---|
| …Contd. | …Contd. | …Contd. | satisfactory explanation for how/why this could have occurred.<br><br>**iii) Bilge well alarms:** The TQC investigator noted there had been frequent activation of the engine room bilge well alarms, which were noted to have been activated <u>44 times in a 15-day period</u>. He also noted that the frequent high-level alarm triggering was in contradiction to the low bilge water production reported for the same period.<br><br>There were no corresponding ORB entries to account for liquid that would have needed to enter/leave the bilges for these alarms to have been activated and deactivated. Triggering of these alarms would require considerable ingress of liquid into the bilges, but there was no record of any such occurrence in the ORB or other documentation, nor was there any record of overboard discharges via the OWS and OCM during that period. The CCM's response was to call into question the record-keeping ability of the Chief Engineer, which did nothing to address our queries. |

# TIMELINE (SPECIAL CONDITION B)

| October 5, 2023 | October 5 – 19 | October 19 | October 27 | November 20, 2023 - January 26, 2024 | December 27, 2023 | December 30, 2023 | January 2, 2024 |
|---|---|---|---|---|---|---|---|
| Empire received notification of Marpol violation aboard MV PANAGIOTIS, from manning agency in Manila, Stella Maris | **No notification to CAM or Interested Parties** **Unilateral investigation conducted by Empire, their attorney and TQC, after which all engine room personnel were off-signed and repatriated** | Empire attorney notified flag Admin, CAM, TPA and Interested Parties of the incident and investigation | Received engine crew contact details from CCM, in response to request from CAM | Multiple attempts made by CAM to contact Chief and 2nd Engineer via telephone and email, with no success | Empire provided Marshall Islands Flag Administration with a copy of the investigation analysis report issued by TQC (commissioned by Empire attorney), dated 12/20/2023. No copy provided to CAM or TPA | Advised by Empire that Marshall Islands Flag Administration would be conducting an investigation into the alleged incident | Marshall Islands Flag Administration reached out to Chief Engr Melitante, providing him with 60 days to submit a statement |

| January 10, 2024 | January 17, 2024 | March 11, 2024 |
|---|---|---|
| Empire attorney provided a copy of the investigation analysis report issued by TQC (commissioned by Empire attorney), dated 12/20/2023. This report had been provided to the Flag Administration earlier, on 12/27.2023.<br><br>Three areas of concern noted by CAM in TQC report and questions conveyed to CCM | Received CCM's replies to each question, none of which addressed the issues at hand | No response received before the deadline from Chief Engineer Melitante. Flag Administration issued a report on their investigation of the Chief Engineer's conduct aboard the MV Panagiotis |

**GALLAGHER MARINE SYSTEMS**

| Special Condition | Chronology of Events | Supporting Documentation | CAM Concerns |
|---|---|---|---|
| **C. Empire Bulkers refused to accept the Environmental Compliance Plan requirement for the Third-Party Auditor (TPA) to conduct reviews of shoreside training.** | **1) 5/24/2023**: Following ECM's appointment on May 18, 2023 as CAM + TPA, a web meeting was set up between ECM, Empire and their attorneys on May 24. At this meeting, Empire's attorney disagreed with our reading of the ECP requirement for the TPA to review shore-based training on site, as described in Attachment 3. The attorney said he would approach the court on this matter but nothing further was heard on that subject.<br><br>**2) 6/20/2024**: We corresponded with Empire's attorney regarding the requirement for shore-side training reviews by the TPA. Again, no consensus was reached despite our pointing out that it was clearly stated in the ECP and we had listed this as one of the TPA's tasks in our initial proposal to Empire and their attorneys, so it should not have come as a surprise to anyone.<br><br>**3) 8/2/2023**: Following completion of two vessel audits by the TPA, Empire's CCM was approached regarding their plans for shore-based training at Manila, Philippines, and our planned review of such training by the TPA. A response was received from their attorney stating that the review could be by remote participation, as the trip would be unnecessary and wasteful. We referred this matter to the DOJ during a phone conversation and took no further action. We were subsequently advised that the matter would be | 1) Doc #12 (Email)<br><br><br><br><br><br><br><br><br><br>2) Doc #14 (Email)<br><br><br><br><br><br><br><br><br>3) Doc #13 (Email) | Insistence by Empire's attorney that no review of shore training was required was ostensibly based on his reading of the requirements as well as the associated costs, even though this matter had been covered in our formal proposal to Empire, sent months earlier.<br><br>As learned from our reviews on past ECPs, a physical shore training review is the only effective monitoring and improvement tool in this context. Also, our TPA vessel audits clearly showed that the training and awareness of ship staff was lacking, and there was a distinct lack of awareness in several key EMS areas. |

| | | | |
|---|---|---|---|
| …Contd. | included among the subjects at an upcoming hearing.<br>**4) 7/19/2024**: Received an update from the CCM, stating that a shore-based training "seminar" had been conducted at the Nautilus Training Center, Manila, on July 10 & 11, 2024. In addition to the course curriculum, the CCM provided sample certification that stated the attendee had successfully completed a one day environmental seminar.<br><br>**5) 7/20/2024**: Since the ECP requires Empire's Training Manager to establish a tracking system to monitor the successful completion of training, we enquired whether the attendees took a written evaluation on completion of the training. Before any response could be received from the CCM, Empire's attorney replied to ask us, asking our company Gallagher Marine Systems for the results of evaluations carried out after (non-ECP related) training that we had conducted in the past. We clarified that we did not provide any kind of training that was required under the Empire Bulkers ECP, but the attorney made repeated enquiries for more information to be provided, even though this had nothing to do with the ECP or the defendant's probation.<br><br>**6) 7/22/2024**: The CCM subsequently confirmed that no testing was conducted after the shore-based training in Manila | 4) Doc #15 (Email)<br><br><br><br><br><br>5) Doc #15 (Email)<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>6) Doc #16 (Email) | The response from Empire's attorney to our enquiry about written evaluations was hard to fathom, as he appeared to be drawing a parallel between the defendant under probation and our organization as TPA + CAM.<br><br>Our enquiry was made to ascertain whether the company had tracked successful completion of training, as the ECP requires. A written evaluation would be the most practical and effective tool to do so. In over a dozen such training course reviews conducted as TPA on previous ECPs, we have found that assessments often yield unexpected results, with both officers and ratings failing in their first attempt, which then requires them to repeat the training in person or remotely, before being assigned to vessels.<br><br>Since the effectiveness of these training courses depends significantly on content, delivery, competence of the faculty and receptiveness of the students, assessments are a vital part of the process to ensure successful completion. |

# TIMELINE (SPECIAL CONDITION C)

| May 18, 2024 | May 24, 2023 | June 20, 2024 | August 2, 2023 | July 17, 2024 |
|---|---|---|---|---|
| Empire's attorney advised ECM that we had been confirmed as both CAM and TPA under the ECP | Introductory web meeting between Empire (Mrs. Lempesi and Capt. Fountoulis), their attorney and ECM (CAM + TPA). Disagreement between ECM and atty on requirements for TPA review of shore training | Further communication between CAM+TPA and Empire atty. No change in their stance that the TPA was not required to do a shore based review of shore training | Completed 2 vessel TPA audits, checked with Empire CCM if any shore training courses were planned for the TPA to review. Their atty responded that the TPA could participate remotely, as a trip to the training center would be "unnecessary and wasteful." | Received update from CCM that shore training was conducted at Manila on July 10 & 11. When asked if attendees took a written evaluation on completion, Empire's atty interjected to ask us (CAM/TPA) for results of training courses we (Gallagher Marine Systems) had conducted. CCM later confirmed that evaluations were not conducted during Empire's training at Manila. |

| Special Condition | Chronology of Events | Supporting Documentation | CAM Concerns |
|---|---|---|---|
| **D. Empire Bulkers eliminated without notice or approval the position of Managing Director required under the Environmental Compliance Plan and modified the reporting chain of the Corporate Compliance Manager as required under the Environmental Compliance Plan.** | **1) 12/13/2023**: During the Initial Shore Operations (Office) audit by TPA, we were advised that the Managing Director (MD) of Empire Bulkers Ltd. had departed in June 2023 with no replacement appointed. Instead, his duties and responsibilities under the Empire Environmental Management System (EMS) had been assigned to an Executive Committee, comprising of the HSQE, Marine & Vetting Manager as Chairman, as well as the CCM, Technical Manager and Marine Operations Manager.<br><br>No notification of the above changes was made to the CAM, TPA and Interested Parties when these took place. Additionally, no Organization Chart was provided at the time of the audit to illustrate the present structure of the organization, responsibilities and functions of personnel involved with the EMS.<br><br>**2) 2/26/2024**: Received email from Empire's CCM notifying the CAM, TPA and Interested Parties of the MD's departure in July 2023 (not June 2023 as mentioned during the Initial shore side audit). The email also informed all of the establishment of an Executive Committee and provided an Organization Chart. | 1) Doc #17 (Email & Report)<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>2) Doc #18 (Email) | In addition to the finding described in the chronology:<br><br>a) Despite the change having occurred 6 months earlier, no Organization Chart was provided at the time of the audit in December 2023, to illustrate the current structure of the organization, responsibilities and functions of personnel involved with the EMS. **Note**: An updated Organization Chart was only received on February 26, 2024.<br><br>b) It was unclear whether the replacement of the MD by an Executive Committee comprising of three Managers (plus the CCM) would still allow the CCM to have direct access to the highest level of management in the Company, as described in ECP Section II.A.1 with respect to the CCM's reporting chain to the MD:<br><br>*"…Empire shall designate a senior corporate officer as the Corporate Compliance Manager ("CCM") who shall report directly to the Managing Director of Empire (the "Empire MD")."* |

| | | | |
|---|---|---|---|
| …Contd. | …Contd. | …Contd. | c) The Quality Assurance and Operational Integrity (QA and OI) group established under the ECP would also be affected by the change in senior management. As per ECP Section II.B:<br><br>*"Empire shall maintain an internal group designed to ensure Quality Assurance and Operational Integrity. This group may consist of members of the HSQE and OI Departments under the direction of the HSQE Manager and CCM respectively. The heads of this group shall report directly to the Empire MD."*<br><br>d) Lastly, if the QA and OI group operates under the direction of the HSQE Manager and CCM, but these two ranks are also part of the Executive Committee that replaced the MD's function under the ECP, it is unclear as to who exactly the HSQE Manager and CCM are now supposed to report to on important QA and OI matters, including internal audits, open reports and casualties and oil pollution incidents. |

## TIMELINE (SPECIAL CONDITION D)

| December 13, 2023 | January 6, 2024 | February 26, 2024 |
|---|---|---|
| During Initial Shore Operations audit at Athens, Empire notified TPA that their MD had departed in June 2023, without being replaced. MD's role under the ECP had been assigned to an Executive Committee with mid-level management | We (CAM/TPA) spoke with USPO and DOJ about this finding, discussed the changes that would take place in the ECP reporting structure as a result of the MD not being replaced. USPO enquired as to why Empire did not notify the Interested Parties when such an important change occurred, to which we had no answer. | Received email from CCM notifying all parties of MD's departure in July 2023 (not June 2023 as previously stated), and replacement by an Executive Committee consisting of three managers + CCM. New Organization Chart provided. |

## Audit & Reporting Timeline under the ECP, from date of appointment of CAM + TPA
**(Empire Bulkers Ltd. commenced probation on January 19, 2023)**

**2023**

| MAY | JUNE | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER |
|---|---|---|---|---|---|---|---|
| 5/18: Received notification from Empire atty of DOJ approving ECM as CAM & TPA | 6/15: Received 2023 Q1 CCM Quarterly Report | 7/12-14: TPA Initial audit aboard MV Scrooge<br><br>7/25-28: TPA Initial audit aboard MV Clarabelle | 8/7: Received 2023 Q2 CCM Quarterly Report<br><br>8/10-11: TPA Initial audit aboard MV Bobic | 9/5: Received notification from Empire atty of alleged Marpol violation aboard MV Panagiotis | 10/10-16: TQC conducted investigation on board MV Panagiotis | 11/26: Received 2023 Q3 CCM Quarterly Report | 12/13-14: Initial Shore-side Operations audit by TPA, Athens. Report submitted 12/28 |

**2024**

| JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST |
|---|---|---|---|---|---|---|---|
| 1/10: Received TQC Investigation & Analysis Report from CCM, on reported Marpol violation aboard MV Panagiotis<br><br>1/13-15: TPA Initial audit aboard vessel Gastone | 2/12: Submitted 1st Year TPA Report of Findings (ROF)<br><br>2/19: Received 2023 Q4 CCM Quarterly Report + Year End Report<br><br>2/28: Submitted Annual CAM report (First Year) | 3/11: Received copy of Flag Admin report for C/E Melitante, regarding reported Marpol violation aboard MV Panagiotis | 4/23: Received Notice of Revocation Hearing, scheduled for September 4, 2024 | 5/2: Received 2024 Q1 CCM Quarterly Report<br><br>5/22-26: TPA Ongoing audit aboard vessel Aphrodite M | | 7/19: Received confirmation of shore-based EMS training conducted at Manila on July 10-11. Course curriculum and sample certification provided.<br><br>7/22: Subpoenas received via email, issued to Nishit Kapoor and Michael Minogue, requiring their presence at the Hearing on September 4, 2024<br><br>7/26: Received 2024 Q2 CCM Quarterly Report | 8/30: Advised by DOJ that the Court had ordered the resolution of all four issues could be determined without additional testimony or evidence, so the presence of the CAM would not be required. |